1

2

3

4

5

6                              IN THE UNITED STATES DISTRICT COURT

7                            FOR THE EASTERN DISTRICT OF CALIFORNIA

8   CURTIS E. PENN,

9                    Petitioner,                    No. CIV S-04-0760 MCE JFM P

10          vs.

11
    MATTHEW C. KRAMER, Warden,
12  et al.,

13                   Respondents.                   <u>FINDINGS AND RECOMMENDATIONS</u>

14  _____/

15                 Petitioner is a state prisoner proceeding in propria persona with an application for

16  a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction

17  on six counts of second degree burglary, five counts of petty theft with a prior, and one count of

18  vandalism (twelve counts total).  Petitioner was sentenced to twenty-nine years to life in state

19  prison.[1]  Petitioner raises twelve claims in his amended petition, filed August 16, 2004, that his

20  prison sentence violates the Constitution.

21                              PROCEDURAL HISTORY

22                 Petitioner filed a timely appeal in the California Court of Appeal, Third Appellate

23  District.  Petitioner contended his convictions on counts one and two were not supported by

24  _____

25          [1] Petitioner's sentences for petitioner's theft with a prior convictions were stayed
    pursuant to California Penal Code § 654 and the twenty-nine year to life portion of the sentence
26  was imposed on count eleven, second degree burglary.  (Clerk's Transcript ("CT") at 209-12.)

1

1   sufficient evidence; the jury should have been instructed sua sponte on his claim of right defense

2   on counts eleven and twelve; the restitution order was excessive to the extent it required payment

3   to a victim's employee; and his sentence constitute cruel and unusual punishment.  The Court of

4   Appeal modified the judgment by striking the restitution order, but otherwise affirmed

5   petitioner's conviction on November 19, 2002.  (Resp.'s Answer, Ex. I.)  Petitioner's petition for

6   rehearing was denied on December 13, 2002.  (Resp.'s Answer, Ex. K.)

7          On December 16, 2002, petitioner filed a petition for writ of habeas corpus in the

8   Sacramento County Superior Court.  (Resp.'s Answer, Ex. L.)  Petitioner raised multiple claims

9   of ineffective assistance of counsel, insufficient evidence to support the convictions, error in

10   denying a motion to exclude evidence of other crimes, erroneous admission of prior theft-related

11   convictions, failure to instruct the jury, prosecutorial misconduct, his sentence constitutes cruel

12   and unusual punishment and double jeopardy.  (Resp.'s Answer, Ex. L.)  The petition was denied

13   on February 6, 2003, both on the merits and with citation to In re Harris, 5 Cal.4th 813 (1993).

14          On January 3, 2003, petitioner filed a petition for review in the California

15   Supreme Court.  (Resp.'s Answer, Ex. N.)  The California Supreme Court denied the petition on

16   February 11, 2003, without comment.  (Resp.'s Answer, Ex. O.)

17          On March 20, 2003, petitioner filed a second petition for writ of habeas corpus in

18   the Sacramento County Superior Court.  (Resp.'s Answer, Ex. P.)  On April 9, 2003, that petition

19   was denied on the merits and with citation to In re Clark, 5 Cal.4th 750 (1993), In re Harris, 5

20   Cal.4th 813 (1993), In re Bower, 38 Cal.3d 865 (1985), In re Waltreus, 62 Cal.2d 218 (1965), In

21   re Dixon, 41 Cal.2d 756 (1953), and In re Swain, 34 Cal.2d 300 (1949).  (Resp.'s Answer, Ex.

22   Q.)

23          On April 23, 2003, petitioner filed a petition for writ of habeas corpus in the

24   California Court of Appeal, Third Appellate District.  (Resp.'s Answer, Ex. R.)  On May 22,

25   2003, that petition was denied without comment.  (Resp.'s Answer, Ex. S.)

26   /////

1        Petitioner filed a petition for writ of habeas corpus in the California Supreme

2   Court on June 13, 2003.  (Resp.'s Answer, Ex. T.)  On March 24, 2004, that petition was denied

3   without comment.  (Resp.'s Answer, Ex. U.)

4        On September 18, 2003, petitioner filed a petition for writ of habeas corpus in the

5   California Court of Appeal, Third Appellate District.  (Resp.'s Answer, Ex. V.)  On October 9,

6   2003, that petition was denied without comment.

7        On October 20, 2003, petitioner filed a petition for writ of habeas corpus in the

8   California Supreme Court.  (Resp.'s Answer, Ex. X.)  That petition was denied without comment

9   on May 12, 2004.  (Resp.'s Answer, Ex. Y.)

10        On April 15, 2004, petitioner filed the instant action.  On August 16, 2004,

11   petitioner filed an amended petition.  On December 1, 2004, respondent filed an answer.  On

12   December 29, 2004, petitioner filed his traverse.

13                                    FACTS

14   Counts 1 & 2, September 1996 (Thrifty/Payless)[2]

15        The evidence at trial showed the following:

16        On several occasions preceding the count one and two offenses,
     [petitioner] entered the then Thrifty/Payless, now Rite Aid, store at
17   1314 Fulton Avenue seeking refunds for merchandise.  The first
     time, he obtained a refund and was not ordered to leave the store.
18   The next time, he entered the store with nothing in his hands and
     then appeared at the refund counter seeking a refund for an item for
19   which he had a receipt.  The assistant manager, Bing Haas, told
     him he had entered with nothing and now had the item; Haas took
20   the item from him and told him to never again enter the store or he
     would be arrested for trespassing.  Approximately one week after
21   being ordered out, [petitioner] was again in the Fulton Avenue
     store and Haas confronted him, stating he had been told not to
22   enter and that he would be arrested for trespassing.  Haas told
     [petitioner] to leave, and he left.  About another week later, "pretty
23   much the same thing" happened.  Haas confronted [petitioner] in

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25        [2]   The facts are taken from the opinion of the California Court of Appeal for the Third
     Appellate District in People v. Penn, No. C034586 (November 19, 2002), a copy of which is
     attached as Exhibit I to Respondent's Answer, filed December 1, 2004.  Petitioner also filed
26   portions of this decision on April 15, 2004.

the store and told him to get out or he would call the sheriff's department.

On the day of the count one and two offenses, Haas saw [petitioner] in the middle of the Fulton Avenue store with nothing in his hands, heading toward a corner of the store.  Based on the prior incidents, Haas followed him.  [Petitioner] went to the bicycle accessories aisle, and Haas, using a hand-held mirror, saw him select a bicycle tire tube in a blue box and place it down the front midsection of his pants.  Haas saw [petitioner] leave the store and enter the parking lot.  Once there, he reached down the front part of his pants and pulled out a bicycle tire tube from the same place where Haas had seen him secret it.  Haas ran after him and said, "Stop."  [Petitioner] started to get on his bicycle but then took off running.  The bicycle had a pouch and a flat back tire.  A letter found in the pouch was addressed to [petitioner].[3]

[Petitioner] testified and denied knowledge of the incident.

A 13-count consolidated complaint, filed in April 1999, alleged that [petitioner] burglarized a commercial building "occupied by RITE AID, located at 980 Florin Road."  At the preliminary hearing, Haas testified that the store was located at "Fulton and Hurley" and was then called "Thrifty/Payless."  At the conclusion of the hearing, the complaint was deemed to be an information.

On the first day of trial, at the People's request, the trial court amended the information by interlineation to state the correct address, 1314 Fulton Avenue.  The next day, the People filed a "Consolidated Information," alleging [petitioner] entered "a commercial building occupied by RITE AID, located at 1314 Fulton Avenue."  Later during trial, at the People's request, the court amended the information by interlineation in several respects not relevant to our discussion; no further amendment of the business address was sought or granted.  Thereafter, on the fifth day of trial, the People filed a "First Amended Consolidated Information" that was "inclusive of prior amendments."  This information identified the store as Rite Aid and bore the 980 Florin Road address, not the 1314 Fulton Avenue address.

(People v. Penn, slip op. at 2-5.)

/////

/////

---

[3]  Haas did not report the September 1996 incident while it was occurring.  The incident was prosecuted after [petitioner] was charged with 10 additional counts that occurred in August and September 1998.

Count 3, August 1998 (Rite Aid)[4]

      Mr. Haas . . . saw [petitioner] enter the store, go to the back corner and conceal an item from the housewares aisle down his pants. Mr. Haas was again using his hand held mirror to observe [petitioner] (1 R.T. pp. 111-112, 115.)  Later Mr. Haas testified that the item concealed was white and like envelopes of the 4 x 6 size.  (1 R.T. p. 156.)  The envelopes were secreted in housewares, not the place where [petitioner] obtained them.  Mr. Haas did not see [petitioner] select the envelopes which were secreted.  (1 R.T. p. 184.)

      [Petitioner] then went to the stationery aisle, selected some 11 x 10 envelopes, and headed for the front of the store.  At checkstand three or four, he set the envelopes down along with a receipt, and told the supervisor ringing that till "You know the drill."  Mr. Haas observed this from about 12 to 15 feet away, then walked up, told [petitioner] no refund today, and took the envelopes from him.  (1 R.T. pp. 112-115.)

      Mr. Haas notes that the receipt matches the envelopes [petitioner] brought to the front, and that the receipt is from the RITE AID store [on] Fulton.  Mr. Haas [said petitioner] never pulled out any money or checkbook to pay for the envelopes.  [Petitioner] threatened his job and wanted to know the district manager's number.  Mr. Haas gave him that number.  (1 R.T. p. 115.)  Mr. Haas testified that he gave [petitioner] the opportunity to bring money out of his pocket to pay for the envelopes, while admitting that at the preliminary examination he testified that he did not give [petitioner] the opportunity to pay for the envelopes.  (1 R.T. p. 159.)  He further testified that [petitioner] said he would buy the envelopes.  (1 R.T. p. 169.)

      Mr. Haas testified that it was common for a customer to discard a receipt after making a purchase.  (1 R.T. pp. 120-121.)  If a person buys a product at one RITE AID, he or she can take that product with the receipt to a different RITE AID and get a refund.  (1 R.T. p. 166.)

      Mr. Haas did not call law enforcement after this incident.  (1 R.T. p. 121.)

      [Petitioner] testified that he entered the store to buy some stationery and had both money and a debit card for that purpose. The envelopes he got were standard white, about 3 1/2 by 11".  He took nothing else off a shelf and secreted nothing on his person.

---

    [4]  The remaining facts are taken from People v. Penn, No. C034586, August 29, 2000, Appellant's Opening Brief, at 6-18, appended to Respondent's Answer, filed December 1, 2004, as Ex. A.)

He went to a register manned by someone who was one of the few who knew how to activate the debit card.  As [petitioner] was reaching for his wallet where he kept the debit card, Mr. Haas arrived and said there would be no refunds that day.  [Petitioner] explained he was not seeking a refund but was there to purchase the envelopes.  Mr. Haas told him to leave the store.  [Petitioner] first demanded and received from the cashier the number for the district manager.  Then he walked out of the store.  He was not allowed to purchase the envelopes.  (2 R.T. pp. 365-374.)

Counts 4 & 5, August 10, 1998 (Lucky Grocery Store)

About 8 in the evening, [petitioner] came through Henry Roddell's checkstand seeking a refund for some items.  The items [petitioner] gave Mr. Roddell did not match the receipt [petitioner] provided.  The refund items were a flea collar, some Milk Bones, and another dog snack.  [Petitioner] was also holding an Aquafina bottle of water.  The bottle appeared new since there was condensation on its outside, and [petitioner] broke open the seal to drink from it.  (1 R.T. pp. 232-235.)

Mr. Roddell called his supervisor, Paul Stephenson, since a cashier could not make a refund on his own when the customer lacks the proper receipt.  (1 R.T. pp. 236, 240.)  No refund was given.  [Petitioner] asked for the return of the items and Mr. Roddell gave them to him.  [Petitioner] left the store.  (1 R.T. pp. 238.)  Mr. Roddell did not see [petitioner] take the dog items off any shelf in the store.  Neither he nor Mr. Stephenson told [petitioner] to leave the items and leave the store.  Mr. Roddell did not ask Mr. Penn about the water he was carrying.  (1 R.T. pp. 242-242.)

When called by Mr. Roddell, Mr. Stephenson verified that the refund items did not match the items on the receipt presented.  After telling [petitioner] that no refund would be given, Mr. Stephenson returned upstairs to the camera room and watched [petitioner] head out of the store.  Then he ran back downstairs and followed [petitioner] out of the front door.  (1 R.T. pp. 247-250.)

Following [petitioner], Mr. Stephenson saw him discard the items he was carrying into a trash can.  Mr. Stephenson caught up to [petitioner] and asked him to return to the store for suspicion of theft.  [Petitioner] asked what would happen if he refused.  Mr. Stephenson warned him that Mr. Stephenson would place him under citizen's arrest.  If [petitioner] did not come, Mr. Stephenson would go inside, call the sheriff, and give [petitioner's] description.  [Petitioner] warned that if he was touched, he would beat Mr. Stephenson.  (1 R.T. pp. 250-252.)

Mr. Stephenson went inside the nearby Petco store, called 911, explained to the dispatcher what had happened, described the

vehicle and license plate number for the car in which [petitioner] drove past. (1 R.T. pp. 252-253.) A deputy arrived shortly, but was not able to find [petitioner]. (1 R.T. pp. 255, 292-293.)

[Petitioner] testified that [he] entered the store on his way to work. Before going into the store, he removed the Aquafina bottle from his ice chest. It was filled with tap water, which he carried . . . because it was hot. His girlfriend had purchased the pet products from a Lucky's store at Loehman's Plaza. They no longer had the pets and therefore did not need the pet products. He wanted a refund. (2 R.T. pp. 391-393.)

Mr. Roddell told him there was a discrepancy, but did not tell him its nature. When Mr. Stephenson arrived, he also said the products do not match, and he could not permit the refund. Mr. Stephenson returned the products to [petitioner] and the latter left the store. (2 R.T. pp. 394-397.)

Mr. Stephenson followed him out of the store, [then] asked him to return into the store because he believed [petitioner] had committed a theft. When Mr. Stephenson reached for him and said he would place [petitioner] under citizen's arrest, [petitioner] threw down his water bottle and warned Mr. Stephenson that if he touched him, [petitioner] would beat him. (2 R.T. pp. 397-398.)

[Petitioner] was offended because Mr. Stephenson was only a clerk and no one in the store indicated there was a possible theft problem with the articles in his possession. (2 R.T. pp. 398-400.) Mr. Stephenson told [petitioner] he would call the police, and went to Petco to do that. [Petitioner] told him okay, and walked to his car. (2 R.T. p. 400.)

At the time of this incident, [petitioner] testified he was on his way to work at Ryder Logistics, sent there by Adecco Temp Agency. (2 R.T. pp. 397, 435, 440.) Gerald Gordy, a senior human resource manager responsible for the employment records of Ryder Logistics in Sacramento County, testified that [petitioner] was not employed at Ryder Logistics anytime during 1998, but that he was employed there for four days in December 1997. (2 R.T. pp. 458-460.) He admitted it was possible that when temporary employees sent by Adecco arrived, he may have already had enough temps and would send a person back to Adecco. (4 R.T. p. 461.)

Counts 6 & 7, August 12, 1998 (Lucky Grocery Stores)

On 12 August, Mr. Stephenson was working a register when he saw [petitioner] walking toward the customer service counter, holding a bottle of Kahlua. Mr. Stephenson recognized him and informed the manager that this was the person with whom he had trouble and called a deputy two

/////

7

days earlier.  He suggested that the Sheriff's Department be called to come and pick him up.  (1 R.T. pp. 255-256.)

Clerks at Luck's have authority to make refunds if the amount is $9.99 or less.  Over that requires a manager's override.  A bottle of Kahlua is $10.99.  The clerk waiting on [petitioner] at the customer service counter asked over the intercom for manager's override and the bookkeeper went out to override it.  Mr. Stephenson saw the clerk give [petitioner] cash back and saw him leave the store.  (1 R.T. pp. 257-258.)  Mr. Stephenson also narrated a security videotape compiled from the 36 cameras in the store to show [petitioner] at various stages of the transaction described.  (1 R.T. pp. 258-263.)

The Police Department was not contacted for this incident.  (1 R.T. p. 262.)  [Mr. Stephenson] agreed that from the tape, he could not determine what item was taken.  (1 R.T. p. 274.)  He saw [petitioner] bring the bottle of Kahlua to the customer service area, but did not see [petitioner] go into the liquor area.  He determined that by reviewing the tape after the incident.  (1 R.T. pp. 286, 288.)

Counts 8, 9 & 10, August 15, 1998 (Rite Aid)

Using his 4" mirror, Mr. Haas observed [petitioner] select a jar with a green top and put it in his right front pocket.  Mr. Haas did not see [petitioner] enter the store, and was observing him from about 50 feet away.  [Petitioner] was holding a basket in his left hand when he selected the jar.  (1 R.T. pp. 122-123, 138.)

Mr. Haas reminded [petitioner] that he had told him not to come into his store or he will have him arrested.  [Petitioner] responded with an obscenity and told him that he could do nothing to [petitioner].  Mr. Haas threatened to call 911, and then did so in front of [petitioner].

After the 911 call, [petitioner] walked around the store and then headed to the front to check out.  At checkstand four, the two exchanged some more words.  Then, to stall for time until the police would arrive. Mr. Haas told [petitioner] he would ring him up, and started fumbling with the contents of the basket.  After Mr. Haas saw that the employees he summoned had gathered, he told [petitioner] he would not ring him up.  [Petitioner] threw the basket on the ground and liquid came out of one of the beverage bottles.  [Petitioner] started walking toward the front door.  (1 R.T. pp. 126-128.)

Mr. Haas grabbed [petitioner] from behind the neck, and 5 or 6 other male employees joined in taking [petitioner] down to the

/////

ground and holding him there.  After Officer Garcia arrived and took charge, Mr. Haas and the employees let [petitioner] go.  (1 R.T. pp. 129-130, 180.)

Mr. Haas observed Officer Garcia reach into [petitioner's] right front pocket and bring out the hair grease.  Mr. Haas had told Officer Garcia that he wanted to press charges for trespassing, and did not tell the officer that [petitioner] was concealing a green jar or item.  (1 R.T. p. 173, 178.)

Alexander Cabaccang, a clerk at RITE AID who participated in the take down, testified that he saw the argument between [petitioner] and Mr. Haas at the checkstand.  (1 R.T. pp. 199, 201-202.)  [Petitioner] wanted to pay for the items in the basket.  [Petitioner] did not turn the basket over and dump the items, but did shove it off the counter.  (1 R.T. p. 203.)

Officer Garcia arrived at RITE AID in response to the call and saw employees struggling with [petitioner] on the floor.  Officer Garcia took charge, handcuffed [petitioner], and escorted him outside to the patrol car.  [Petitioner] was cooperative.  Officer Garcia conducted a quick search of [petitioner] and, from his right front pant pocket, removed a plastic container of Tres Flores hair grease.  Mr. Haas told him that the product was new, not used, and the property of the store.  (1 R.T. p. 206-209, 211.)  Mr. Haas did not tell Officer Garcia that he saw [petitioner] conceal the item.  (1 R.T. p. 211.)

[Petitioner] testified that he entered [the] store to buy some toiletry items, some iced tea, and some chlorine for a girlfriend's pool.  As he was gathering the items in a basket, Mr. Haas appeared and said he (Haas) had told him not to come in his store again.  [Petitioner] replied that Mr. Haas could do nothing to him.  Mr. Haas threatened to call the police, and [petitioner] told him to go ahead.  (2 R.T. pp. 375-376, 434-435.)

After the 911 call was made, [petitioner] continued putting things in his basket.  Then he explained to Mr. Haas that all he wanted to do was purchase the things he had in the basket and then he [petitioner] would be out of Mr. Haas' hair.  Mr. Haas told [petitioner] to come with him to register four.  [Petitioner] put the cart on the counter and Mr. Haas began slowly taking the items out of the basket.  When [petitioner] reached for his wallet, Mr. Haas announced that he had changed his mind and again told [petitioner] to leave the store.  [Petitioner] pushed the basket off the counter.  (2 R.T. pp. 378-381.)

Mr. Haas again told [petitioner] to leave the store, and told [petitioner] to go ahead and hit him and he would go to jail.  [Petitioner] turned around, took two steps, and Mr. Haas jumped on him from behind, with his arm around [petitioner's] throat,

9

choking him.  Then, at Mr. Haas' orders, 3 or 4 other employees grabbed [petitioner], one on each arm and one on each leg, and slammed him down on the floor.  (2 R.T. pp. 383-386.)

When Officer Garcia arrived, he told the employees to get off of [petitioner], handcuffed [petitioner], took him outside to the patrol car, searched him and withdrew the container of hair grease from [petitioner's] pocket.  Mr. Haas said it was a product of that store.  (2 R.T. pp. 388-390.)

[Petitioner] testified that he purchased the hair grease at Hair Plus, a store just east of RITE AID.  He had a receipt for the product in his hand, but it was taken by someone while the RITE-AID employees had him on the floor.  He testified that RITE AID does not sell that product.  (2 R.T. pp. 377, 387.)

Counts 11 & 12, September 24, 1998 (Copeland Sports)

Sally Halder runs the front cash register for Copeland Sports.  On September 24 she saw [petitioner] come in the front door and put down a Macy's bag on the right side of her register as he came in.  He just dropped it and kept going.  The bag was small and maybe had a T-shirt folded inside.  [Petitioner] had nothing else in his hand as he walked past her.  (1 R.T. pp. 294-296.)  [Petitioner] walked into the men's shoe department and later returned to her register, putting down a pair of Reebok shoes in a blue box a little off to the side, and went back into the store.  (1 R.T. p. 297.)

When he returned to the register again, he picked up the Macy's bag and put it on the shoe box.  He said he had bought the shoes he had placed at her register at the Copeland Sports store on Arden the night before.  He decided not to exchange them.  He picked up the shoe bag and the Macy's bag and left the store.  Ms. Halder had looked for security sensors on the shoes and found none.  If there were sensors on the shoes, there would be a beep when someone carried them out the door.  She saw their security person, Ryan McLucas, follow [petitioner] out the front door.  (1 R.T. pp. 298-300.)

Ryan McLucas is an asset protection agent for Copeland Sports.  Through the cameras at Copeland Sports he observed [petitioner] walking through the shoe department, and apparently removing sensors from a pair of shoes.  He then watched [petitioner] carry that box of shoes towards the front of the store, place it on the table by Ms. Halder's register, and return to the store.  When [petitioner] returned to Ms. Halder's register, Mr. McLucas observed [petitioner] collect a Macy's bag and the shoe box, engage in a little conversation, and then head towards the front door.  (2 R.T. pp. 311-317.)

/////

At this point, Mr. McLucas ran after [petitioner], approached him outside the store, identified himself as store security, and asked [petitioner] to put down the box and place his hands on his head. [Petitioner] complied, but ran as Mr. McLucas tried to grab [petitioner's] hands to handcuff him.  Assisted by two other employees, Mr. McLucas chased [petitioner], caught and tripped him, handcuffed him, and returned him to the store until law enforcement arrived.  (2 R.T. pp. 317-319.)

Mr. McLucas recovered the shoes and did not find any sensor tags on them.  He did find sensor tabs in the shoe display shelves. (2 R.T. p. 320.)  Mr. McLucas then narrated a videotape made from the security cameras.  (2 R.T. pp. 321-328.)

Officer Eugene Shim testified that he was [dispatched] that afternoon to Copeland's to place in custody [petitioner], being held by Copeland's loss prevention in custody for shoplifting.  Officer Shim identified Exhibit 11 as receipts recovered from [petitioner's] person.  (2 R.T. pp. 306-308.)

[Petitioner] testified to entering Copeland Sports to spend some time before a movie he intended to see.  He had with him a Macy's bag and a box of Reebok tennis shoes purchased the day before at Copeland's store in Arden.  (2 R.T. p. 402.)  Upon entering the store, he went to the register and laid down his Macy's bag and the box of shoes, separate from one another.  After browsing through other departments, he entered the shoe department, removed the sensors from a box of shoes, and took the box of shoes back to the front portion of the register.  Leaving the new box of shoes by the register, he walked through the store again and decided not to make the switch of boxes he had originally planned while removing the sensors.  He returned to the registers, retrieved the Macy's bag and the box of shoes he had originally brought with him, and left the store.  (2 R.T. pp. 408-412.)

Outside the store, Mr. McLucas made contact with [petitioner]. After initially complying with Mr. McLucas's commands, [petitioner] ran.  He felt guilty for pulling the sensors off the shoes he had left in the store, and he also knew that he had a warrant pending.  (2 R.T. pp. 413-414.)

(People v. Penn, No. C034586 (August 29, 2000), Appellant's Opening Brief, at 6-18, appended

to Respondent's Answer, filed December 1, 2004, as Exhibit A.)

/////

/////

/////

11

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state

1  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

2  federal habeas court independently reviews the record to determine whether habeas corpus relief

3  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

4  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

5  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

6  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

7  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

8  1167 (9th Cir. 2002).

9  II.  Procedural Default

10         As the United States Supreme Court has explained, in all cases in which a state

11  prisoner has defaulted his federal claim in state court pursuant to an independent and adequate

12  state procedural rule, federal habeas review of the claim is barred unless the prisoner can

13  demonstrate cause for the default and actual prejudice as a result of the alleged violation of

14  federal law, or demonstrate that failure to consider the claims will result in a fundamental

15  miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The state rule is only

16  "adequate" if it is "firmly established and regularly followed."  Id.  (quoting Ford v. Georgia, 498

17  U.S. 411, 424 (1991)); Bennett v. Calderon, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

18  adequate, the state law ground for decision must be well-established and consistently applied").

19  The state rule must also be "independent" in that it is not "interwoven with the federal law."

20  Park v. California, 202 F.3d 1146, 1152 (9th Cir. ), cert. denied, 531 U. S. 918 (2000) (quoting

21  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  Even if the state rule is independent and

22  adequate, the claims may be heard if the petitioner can show: (1) cause for the default and actual

23  prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the

24  claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

25         Although the question of procedural default "should ordinarily be considered

26  first," a reviewing court need not do so "invariably," especially when it turns on difficult

13

1  questions of state law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v.

2  Dretke, 359 F.3d 708, 720 (5th Cir. 2004).  In order to determine whether petitioner's claims

3  were subject to a state procedural bar, this court would have to decide, among other things, which

4  state procedural rule(s), if any, bar which particular claim, if any, when the state procedural

5  rule(s) became firmly entrenched, and whether the rule(s) have been consistently and regularly

6  applied.  In this case, this court finds that petitioner's claims can be resolved more easily by

7  addressing them on the merits.  Accordingly, this court will assume that petitioner's claims are

8  not defaulted and will address them on the merits.

9  III.  Petitioner's Claims

10       A.  First Claim

11            Petitioner's first claim is that the trial court erred by failing to *sua sponte* instruct

12  the jury as to claim of right defense on counts eleven and twelve.

13            The last reasoned rejection of this claim is the decision of the California Court of

14  Appeal for the Third Appellate District on petitioner's direct appeal.  (Resp.'s Answer, Ex. I.)

15  The state court addressed this claim as follows:

16       "A court must instruct sua sponte on general principles of law
         that are closely and openly connected with the facts presented at
17       trial.  ([Citations.]"  (*People v. Ervin* (2000) 22 Cal.4th 48, 90.)
         Here, [petitioner] claimed the shoes he carried out of Copeland's
18       Sports were his own, not the store's.  We shall assume for present
         purposes that "clearly and openly connected with" [petitioner's]
19       taking of his own shoes is the legal principle that the taking of
         one's own property is not theft.  (Ibid.)
20
21       However, the failure to instruct with an instruction equivalent to
         CALJIC No. 9.44 was not prejudicial.  The jury was instructed
22       with CALJIC No. 14.40, which provided in relevant part that "Any
         person who steals, takes, carries, leads, or drives away the personal
23       property of *another* with the specific intent to permanently deprive
         the owner of his property is guilty of the crime of petty theft . . . ."
24       (Italics added.)

25       Here, [petitioner's] only "claim of right" or "good faith claim of
         title or right to ownership" was to *his own pair of shoes*, not to any
26       shoes owned by Copeland's Sports.  (See fn. 4, ante.)  By
         convicting [petitioner], the jury necessarily found that he had

1   carried away the shoes of *another*, not his own shoes, and that the
2   factual scenario to which the claim-of-right instruction would have
    applied did not exist.  It is not reasonably probable the jury would
3   have reached a different verdict had the court given an instruction
    equivalent to CALJIC No. 9.44 on its own motion.  (*People v.*
4   *Ervin, supra*, 22 Cal.4th 48, 91; see *People v. Watson* (1956) 46
    Cal.2d 818, 836.

5   (People v. Penn, slip opin. at 10-11.)

6         In general, a challenge to jury instructions does not state a federal constitutional

7   claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

8   U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

9   warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

10  erroneous, or even "universally condemned,"' but must violate some due process right

11  guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir.

12  1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

13  petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the

14  resulting conviction violates due process.'"  Middleton v. McNeil, 541 U.S. 433, 437 (2004)

15  (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  In making its determination, this court

16  must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as

17  a component of the entire trial process.'"  Prantil, 843 F. 2d at 317 (quoting Bashor v. Risley, 730

18  F.2d 1228, 1239 (9th Cir. 1984)).  See also Middleton, 541 U.S. at 437.  Where, as here, the

19  challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially

20  heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than

21  a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte

22  v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

23        Petitioner has failed to sustain his "heavy burden" of demonstrating a miscarriage

24  of justice based upon the trial court's failure to give the instruction.  Here, the trial court did not

25  prevent petitioner from arguing to the jury that he lacked the intent to steal.  Petitioner had a fair

26  opportunity to present whatever evidence he had that would indicate his absence of intent, and he

had a fair opportunity to have the facts in the case argued to the jury.  In other words, petitioner

was denied a jury instruction, not a defense.  Compare Conde v. Henry, 198 F.3d 734, 741 (9th

Cir. 1999) (trial court violated due process where defendant's proposed defense was supported by

law and had some foundation in the evidence, but the trial court improperly precluded

defendant's attorney from making closing argument explaining the defendant's theory of the case,

refused to instruct the jury on the defendant's theory and, over the defendant's objection, gave

erroneous instructions that did not require that the jury find every element of the offense).

       Petitioner's argument that the state was relieved of its burden to prove specific

intent to steal is also unavailing.  The jury was instructed as to specific intent, as well as CALJIC

14.40, which required the jury to find petitioner had taken the personal property of another.

The jury is presumed to follow the court's instructions.  Weeks v. Angelone, 528 U.S. 225, 234

(2000).  Accordingly, any error was harmless under the circumstances of this case.  See Neder v.

United States, 527 U.S. 1, 4 (1999) (state court's error in giving a jury instruction that omitted an

element of the offense subject to harmless error analysis).  For the reasons explained in the

opinion of the California Court of Appeal, the facts of this case demonstrated that petitioner took

the shoes from Copeland's with the intent to steal.  Because the jury reasonably could have

concluded that petitioner was guilty, any error in failing to instruct on a "claim-of-right defense"

with respect to other theories of liability could not have had a substantial effect on the ultimate

verdict in this case.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(on collateral review,

an error is not "harmless" if it "had substantial and injurious effect or influence in determining

the jury's verdict").  See also Fry v. Pliler, ___ U.S. ___, 127 S.Ct. 2321 (2007) (in habeas

proceedings, federal court must assess prejudicial impact of constitutional error under the Brecht

standard).  For these same reasons, the omission of a jury instruction on claim of right did not

render petitioner's trial fundamentally unfair, in violation of the due process clause.  Accordingly,

for all of the above-described reasons, petitioner is not entitled to relief on this jury instruction

claim.

B.  Second Claim

Petitioner's second claim is that his sentence under California's Three Strikes law is cruel and unusual punishment.

On direct appeal, the California Court of Appeal rejected this claim citing Andrade v. Attorney General of State of California, 270 F.3d 743 (9th Cir. 2001) and Brown v. Mayle, 283 F.3d 1019 (9th Cir. 2002).  (People v. Penn, slip opin. at 14-15.)  The court found petitioner's recidivism to be more serious than Andrade's and petitioner "reoffended by committing 11 counts in six separate incidents" as opposed to a single incident involved in Brown.  (People v. Penn, slip opin. at 15.)  The court distinguished petitioner's case from Solem v. Helm, 463 U.S. 277 (1983), finding petitioner's record more egregious "because it include[d] prior convictions of robbery and attempted robbery," and "his current offenses [were] more serious than passing a $100 no account check."  (People v. Penn, slip opin. at 16.)  The court noted that petitioner was "being punished for reoffending following a robbery conviction and an attempted robbery conviction," not because he committed six counts of second-degree burglary. (Id. at 16-17.)

> [Petitioner] has 12 present convictions for second-degree burglary, petty theft and vandalism.  He was convicted of petty theft in 1996, false representation of identity and petty theft in 1995, two counts of petty theft in 1994, robbery and attempted robbery in 1991, and passing a bad check in 1991.  In short, [petitioner] has engaged in a lengthy period of antisocial behavior.  His sentence does not shock the conscience or offend fundamental notions of human dignity. [Citations omitted.]

(Id. at 18.)

> "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual.  This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code.  It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.]  Otherwise, California could never take the toughest stance against repeat offenders or any other type of

/////

17

1    criminal conduct." (*People v. Martinez* (1999) 71 Cal.App.4th
2    1502, 1516.)

3    (Id. at 19-20.)

4         In Lockyer v. Andrade, 538 U.S. 63 (2003), the United States Supreme Court
5    made clear that, in the context of an Eighth Amendment challenge to a prison sentence, the "only
6    relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of'
7    framework is the gross disproportionality principle, the precise contours of which are unclear,
8    applicable only in the 'exceedingly rare' and 'extreme' case." Andrade, 538 U.S. at 73 (citing
9    Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983);
10   and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  The Andrade Court concluded that two
11   consecutive 25-years-to- life sentences with the possibility of parole, imposed under California's
12   three-strikes law following two petty theft convictions with priors, did not amount to cruel and
13   unusual punishment.  Id. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a
14   sentence of 25 years to life imposed for felony grand theft under California's three-strikes law did
15   not violate the Eighth Amendment).  "Outside the context of capital punishment, successful
16   challenges to the proportionality of particular sentences have been exceedingly rare."  Rummel,
17   445 U.S. at 272.

18        In Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), the United States Court of
19   Appeals for the Ninth Circuit held, post-Andrade, that a three strike sentence of twenty-five years
20   to life in prison for a third shoplifting offense, a "wobbler" under state law[5], constituted cruel and
21   unusual punishment.  In Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the court of appeals
22   distinguished Ramirez, finding that the petitioner in Rios had a "lengthy criminal history," had
23   "been incarcerated several times," and because the strikes used to enhance the petitioner's
24   sentence had "involved the threat of violence."  Id. at 1086.

25

26        [5] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony
     under applicable law.  See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

1    Unlike the petitioners in <u>Rios</u> and <u>Ramirez</u>, in the instant case petitioner's

2  commitment offense is not a "wobbler" under California law; it is a felony.  <u>See</u> California Penal

3  Code § 459.  In addition, petitioner has a lengthy criminal history as noted by the California

4  Court of Appeals.  Petitioner's prior felony robbery and attempted robbery convictions were the

5  strikes use to enhance petitioner's sentence.  (<u>Id</u>. at 121-122.)  Petitioner's sentence does not fall

6  within the type of "exceedingly rare" circumstance that would support finding that his sentence

7  violates the Eighth Amendment.

8    The state court's rejection of petitioner's second claim for relief was neither

9  contrary to, nor an unreasonable application of, controlling principles of United States Supreme

10  Court precedent.  Petitioner's second claim for relief should be denied.

11    C.  <u>Third Claim</u>

12    Petitioner's third claim is that use of his pre-1994 convictions to calculate his

13  sentence under the Three Strikes Law violated the double jeopardy and ex post facto clauses

14  prohibit his three strike sentence, rendered his prior guilty pleas involuntary and constituted a

15  breach of the prior plea agreements.

16    This claim was rejected by the Sacramento County Superior Court on the grounds

17  that the claim was successive under <u>Clark</u>, was not raised on appeal under <u>Dixon</u>, and lacked

18  merit based on California law, citing <u>People v. Hatcher</u>, 33 Cal.App.4th 1526, 1527-1528

19  [internal citation omitted].  (<u>In re the Matter of Curtis Eugene Penn</u>, 03F02734 (Resp.'s Answer,

20  Ex. Q at 5).)

21    Petitioner's commitment offenses occurred in 1996 and 1998, and the conviction

22  that incurred the Three Strikes calculation occurred on September 24, 1998.  Petitioner's Three

23  Strikes Sentence was imposed pursuant to California Penal Code § 667(d), which was enacted by

24  the California legislature in March 1994.  <u>See</u> <u>Dillard v. Roe</u>, 244 F.3d 758, 768 n.10 (9th Cir.

25  2001).  Since petitioner's commitment offense occurred after enactment of Cal. Pen. Code

26  § 667(d), there is no ex post facto violation in use of pre-1994 strikes to enhance his sentence and

19

1  the sentence does not violate the Constitution.  See U.S. v. Kaluna, 192 F.3d 1188, 1199 (9th Cir.

2  1999).[6]

3        Petitioner's second argument is factually incorrect.  Use of the prior convictions

4  enhanced the punishment imposed for his current commitment offense.  It did not change the

5  original punishment imposed for those prior convictions at the time those convictions were

6  sustained.  The record reflects that petitioner's sentence was enhanced based on petitioner's

7  conviction on count eleven (second degree burglary).  (CT at 209-12.)  Moreover, even assuming

8  *arguendo* that petitioner was not advised that his conviction could be used as a strike to enhance

9  a sentence for a subsequent conviction, that lack of advisement does not render invalid

10  petitioner's no contest plea.  See United States v. Brownlie, 915 F.2d 527, 528 (9th Cir. 1990)

11  (defendants need only be advised of direct consequences of guilty plea, and "possibility that the

12  defendant will be convicted of another offense in the future and will receive an enhanced

13  sentence based on an instant conviction is not a direct consequence of a guilty plea.")  Supreme

14  Court precedent requires only that criminal defendants be "fully aware of the direct

15  consequences" of their guilty pleas.  Brady v. United States, 397 U.S. 742, 755 (1970).  Petitioner

16  has not shown that his failure to be advised of possible collateral consequences from the future

17  enactment of a recidivist statute violated his constitutional right so as to warrant habeas relief.  In

18  essence, this claim merely restates petitioner's ex post facto argument, rejected for the reasons

19  stated above.  Accordingly, this claim should also be denied.

20  /////

21  /////

22

---

23     [6] Petitioner argues that Duran v. Castro, 227 F.Supp.2d 1121 (E.D.Cal.2002) supports his
argument that his sentence violated the Eighth Amendment because severe punishment under the

24  "Three Strikes" law is cruel and unusual unless the offense for which sentence is imposed is
similar in nature to the prior "strikes."  However, Duran relied heavily on the circuit's opinion in

25  Andrade v. Attorney General of the State of California, 270 F.3d 743 (9th Cir.2001), a decision
subsequently overturned by the United States Supreme Court in Lockyer v. Andrade, 538 U.S. 63

26  (2003).  Thus, Duran does not compel a different result here.

1          D.  Fifth Claim[7]

2          Petitioner claims trial counsel was ineffective because he failed to (1) investigate

3   and interview certain witnesses, (2) object to the prosecutor's line of questioning,

4   mischaracterizing evidence and making improper remarks; (3) object to errors in the jury

5   instructions; and (4) submit a motion to bifurcate the charges against petitioner.  After reciting

6   the legal standards, the court will address these claims seriatim.

7          The Sixth Amendment guarantees the effective assistance of counsel.  The United

8   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

9   Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

10  counsel, a petitioner must first show that, considering all the circumstances, counsel's

11  performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

12  identifies the acts or omissions that are alleged not to have been the result of reasonable

13  professional judgment, the court must determine whether, in light of all the circumstances, the

14  identified acts or omissions were outside the wide range of professionally competent assistance.

15  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

16  he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice

17  is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

18  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

19  probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

20  at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

21          Petitioner cites multiple instances of defense counsel's errors.

22          i.  Failure to investigate and interview witnesses

23          Claim one was rejected by the Sacramento County Superior Court on procedural

24

25          [7]  The court addresses petitioner's claims of ineffective assistance of trial counsel first.
    His fourth claim alleging ineffective assistance of appellate counsel will be dealt with
26  immediately after this section.

grounds (successive), and on the merits, except for three witnesses petitioner added to the instant

petition.  (Resp.'s Answer, Ex. M & Q.)  Claim one was also rejected by the California Supreme

Court without comment.  (Resp.'s Answer, Ex. U.)

In the amended petition, petitioner initially claims defense counsel was ineffective

for failing to interview Rachel Sandoval, Lucky's grocery store customer service clerk, Steve

Hardin, Lucky's manager, and Gloria, Lucky's bookkeeper, to ascertain whether Paul

Stephenson's testimony that he saw petitioner receiving a refund for alcohol on August 12, 1998

was credible.  (Id. at 50.)  Petitioner argues these witnesses might be able to challenge Paul

Stephenson's testimony because Stephenson might not have been able to clearly see petitioner

attempting to return alcohol for a refund.

Petitioner has not provided declarations from these potential witnesses reflecting

they would have testified that Paul Stephenson was unable to see the transaction.  Although

petitioner claims they might have testified in such a way to impeach Stephenson, it is just as

likely their testimony would have corroborated Stephenson's testimony.  Without knowing

exactly what these potential witnesses would have said, petitioner cannot demonstrate that the

outcome would have been different, failing the prejudice prong of Strickland.

But even if petitioner had obtained the declarations and these witnesses would

have testified that Stephenson was not in a position to clearly view the transaction, the record

reflects that on cross-examination, defense counsel was able to elicit testimony from Stephenson

that he was about thirty feet from petitioner, had his back to petitioner and turned around

"constantly" to watch what petitioner was doing.  (RT 272.)  Petitioner pointed out that

Stephenson admitted that the videotape resolution was not high quality so he could not determine

what item petitioner selected from the store's shelf or what aisle petitioner was in at the time,

citing RT 274-75.  (Traverse at 34.)

Thus, the jury was aware of Stephenson's location and the possibility that he

either could not clearly see the transaction or did not witness the entire transaction.  The video

1   surveillance tape from the Lucky's Grocery Store which showed petitioner taking an item off the

2   shelf,[8] returning an item, the cash register drawer opening, money exchanging hands, and

3   petitioner leaving the store, as well as the refund receipt for the Kahlua bottle, were admitted as

4   evidence at trial.  (RT 260-65; 274, 278, 286.)  Because the video and the refund receipt partially

5   corroborated Stephenson's testimony, any additional effort to impeach Stephenson on this issue

6   would have failed because the jury had benefit of petitioner's position that Stephenson could not

7   clearly view the transaction.  In light of the above, defense counsel could not be deemed

8   ineffective for failing to interview these potential witnesses.

9          Petitioner next faults defense counsel for failing to call Lee Ramos, defense

10  investigator, and John Martin, Lucky's Grocery Store manager, to testify that Lucky's had a store

11  policy forbidding return of alcohol for refunds to impeach Stephenson's testimony that he saw

12  petitioner return the alcohol.

13          The Sacramento County Superior Court rejected this claim as follows:

14          . . . [P]etitioner attaches only a copy of a report from the defense
            investigator; he does not attach an affidavit from John Martin, as to
15          what Martin would have testified to at trial, nor does he attach a
            reasonably available copy of trial transcript of the testimony of
16          Paul Stephenson.  Without a copy of the testimony of Stephenson,
            this court cannot evaluate whether Martin's statement would have
17          impeached Stephenson, or if it did, whether the admission of
            Martin's statement was reasonably likely to have made a difference
18          in the outcome of the trial (see Strickland v. Washington (1984)
            466 U.S. 668).  It was petitioner's burden to attach the reasonably
19          available documentary evidence, and his failure to do so requires
            denial of the claim (In re Harris (1993) 5 Cal.4th 813, 827 fn. 5).
20          However, the preliminary hearing transcript indicates that Paul
            Stephenson at that time testified that on August 10, 1998,
21          Stephenson was working and petitioner had attempted to obtain a
            refund for items from Stephenson but the items did not match
22          those listed on the receipt so the refund was refused, then petitioner
            walked out of the store with items, stealing them, and that on
23          August 12, 1998, that Paul Stephenson was again working, even

24  ─────────────────────

25          [8]  The record states that petitioner can be seen taking a bottle of Kahlua off the shelf (RT
        263), but on cross-examination, Stephenson makes clear that the video is not clear enough to
26      show it was a bottle of Kahlua being taken off the shelf.  (RT 274.)  In light of all the evidence
        taken together, it is a distinction without a difference.

                                        23

1    though a detective's report had noted that he was not working, and
2    saw petitioner enter the store, then watched him on the surveillance
     tape as petitioner obtained cash for a bottle of Kahlua.  Even if
3    Stephenson repeated this testimony at trial, petitioner fails to state
     a prima facie case for relief, as the possibility that the store had a
4    policy not to allow refunds for alcohol does not mean that some
     employees failed to follow that policy, as appeared to have been
5    the case that day.  Thus, even if petitioner had presented John
     Martin as a witness at trial, and he had testified to the store's policy
6    or was impeached with his prior statement to the investigator about
     the store's policy, it would not have impeached Stephenson's
7    testimony of what he observed occurring in the store on August 12,
     1998.  The claim, therefore is denied (In re Bower (1985) 38
     Cal.3d 865).
8

9    (Resp.'s Answer, Ex. M.)

10           The record reflects the jury was made aware of the store's policy concerning

11   return of alcohol.  (RT 278.)

12           The state court properly applied Strickland in evaluating this claim.  Whether or

13   not the store had a policy of not allowing the return of alcohol for refund would not have

14   impeached Stephenson's testimony at trial, for the reasons cited by the state court.  The state

15   court's ruling is not contrary to, nor an unreasonable application of, clearly established federal

16   law.  This claim should be denied.

17           Petitioner also claims defense counsel was ineffective because he failed to call

18   Detective Cater to testify that Stephenson had not been working on August 12, 1998.  The state

19   court rejected this claim as follows:

20           As noted above, however, Stephenson did testify at the
     preliminary hearing that he had heard that the detective had stated
21   that in a report, but that the detective had been in error because he
     did, in fact, work that day at the store.  Again, petitioner does not
22   attach reasonably available trial transcript to show that Stephenson
     did not testify about this at trial, requiring denial under Harris.  If
23   Stephenson had testified any differently at trial, he could have been
     impeached with this statement from the preliminary hearing.  It is
24   not reasonably likely that had Cater's report been admitted at trial
     it would have made any difference in the outcome of the trial,
25   requiring denial under Bower and Strickland.

26   (Resp.'s Answer, Ex. M.)

1          At the preliminary hearing, Stephenson pointed out that the police report

2    incorrectly stated he was not working on August 12, 1998.  (CT 97.)  At trial, Stephenson

3    confirmed he had been working at the Lucky's grocery store on August 12, 1998.  (RT 255.)  In

4    light of the videotape and the refund receipt (RT 260-65; 274, 286), it is not probable that the

5    admission of Cater's report would have changed the outcome on counts 6 and 7.  The state court

6    properly applied Strickland; this claim should be denied.

7          With regard to counts 8 and 9, petitioner alleges defense counsel was ineffective

8    for failing to call Lee Ramos, defense investigator, and Brian Levin, Rite Aid assistant manager,

9    to testify that Rite Aid does not carry "Tres Flores" hair grease to impeach the testimony of Bing

10   Haas, Rite Aid store manager, who testified he saw petitioner take and conceal the hair grease

11   into petitioner's front pocket.

12          The Sacramento County Superior Court rejected this claim as follows:

13          . . . [P]etitioner attaches only a copy of the investigator's report,
             which blocks out the location of the Rite Aid store that Levin was
14          assistant manager of.  As Haas testified at least at the preliminary
             hearing that he worked in three different store locations, petitioner
15          fails to match up the particular Rite Aid store with the one that was
             in question for the "Tres Flores" incident.  Further, the
16          investigator's report indicates that petitioner himself had told the
             investigator exactly which aisle the product could be found on,
17          indicating that petitioner himself believed it was there in the store
             and at an exact location – it may have been that the investigator
18          went to the wrong Rite Aid store, or that the store was out of the
             item and the assistant manager just thought it was not carried at all,
19          or perhaps it had been discontinued.  At any rate, petitioner does
             not establish that had this been introduced at trial, it would have
20          been likely to make a difference in the outcome of the trial,
             requiring the denial of the claim under Bower and Strickland.

21

22   (Resp.'s Answer, Ex. M.)

23          Petitioner contends that the report from Lee Ramos confirms that the Rite Aid

24   store at 980 Florin Road demonstrates that the store did not carry "Tres Flores."  (Am. Pet. at 51

25   & Ex. E)  However, the copy of the Ramos report has all locations blacked out; there is no

26   specific reference to the Rite Aid store at 980 Florin Road.  But even if Ramos was talking about

the Rite Aid at 980 Florin Road, the conduct underlying counts 8 & 9 took place on August 15, 1998; the investigator went to the Rite Aid store on August 31, 1999, a little over a year later. The investigator could not find the product on the shelves and the assistant manager stated "he did not believe that they carried that particular item."  (Am. Pet., Ex. E at 4.)  It appears the investigator took no further steps to confirm that the store did not carry the item on or about August 15, 1998.  The Ramos report is insufficient to prove the Rite Aid store did not carry "Tres Flores" on or about August 15, 1998.  Petitioner has provided no additional evidence to support that theory.  Thus, petitioner cannot meet the prejudice prong of Strickland.

ii.  Failure to object to prosecutor's actions

In claim two, petitioner alleges defense counsel was ineffective for failing to object to the prosecutor's line of questioning, mischaracterizing evidence and making improper remarks.  Claim two was rejected by the Sacramento County Superior Court as being successive and for not being raised on appeal (Resp.'s Answer, Exs. M, Q), and the California Supreme Court without comment (Resp.'s Answer, Ex. U.)  Thus, there is no reasoned state opinion as to claim two and the court will review this claim de novo, addressing each subclaim seriatim.

With regard to counts 4 and 5, petitioner contends defense counsel should have objected when the prosecution suggested petitioner was "selfish and inconsiderate" for failing to return the pet products to his girlfriend rather than throwing them in the trash, citing RT 391-400. (Am. Pet. at 51.)  As respondent points out, the record simply does not reflect that the prosecution said or intimated that.  (Answer at 43, citing RT 391-400.)

The fact that petitioner threw the pet products in the trash rather than returning them to his girlfriend was curious and the prosecution was entitled to inquire as to why petitioner did that.  The prosecution asked petitioner why he hadn't just put the pet products in his car so he could seek a refund from the Lucky's on Fulton.  (RT 440.)  Petitioner responded that he wasn't going to quibble over $10.00 and since the receipt didn't match and he no longer needed the products, he opted to just throw them away.  (RT 440.)  The prosecution then said:

26

1        Q:  But if you brought it home, you could give it to your girlfriend –

2        A:  I don't need to go through all the trouble for $10.

3        Q:  But that wasn't your $10.  That was her $10.

4        A:  Regardless of the point whose it is.

5  (RT 440-41.)  During closing argument, the prosecution argued:

6            [Petitioner's] explanation is that his girlfriend bought the items at
           a Lucky's on Fulton.  When I asked him "Why didn't you just stay
7          there and straighten this thing out, the police are coming up, you
           are saying you didn't commit any theft at all, just stay there and
8          resolve it," his explanation was "I was in a hurry to go to work."

9            That's what he says, but he still couldn't explain really why
           would he throw away these items in the trash?  If you know where
10         you bought it – or he claimed he bought it – why not just bring it
           back to the place where it was purchased and get a refund that
11         way?  He couldn't explain that.

12  (RT 492.)

13            The questioning and closing arguments by the prosecution were reasonable and

14  based on the evidence adduced at trial.  Thus, the comments did not render the entire trial unfair.

15            Petitioner next contends defense counsel failed to object to the prosecution's

16  questioning of Gerald Gordy, manager of Ryder Logistics, former employer of petitioner.  (Am.

17  Pet. at 52.)  Petitioner argues defense counsel should have objected because Gordy's testimony

18  misled the jury to assume petitioner was unemployed for the entire year of 1998.  (Id.)

19            However, Gordy's testimony was that petitioner had not been employed at Ryder

20  Logistics except for four days in 1997.  (RT 459-60.)  Gordy did not state that petitioner had not

21  been employed elsewhere in 1998, just that he had no record of petitioner working at Ryder in

22  1998.  (Id.)  There was no basis for an objection by defense counsel.  Although petitioner claims

23  defense counsel should have objected because it raised an inference he had not worked for all of

24  1998, the more relevant inference was that petitioner was lying when he claimed he had to leave

25  the scene before police arrived because he was "late for work."  Defense counsel was not

26  ineffective for failing to object to this testimony.

1      As to counts 11 and 12, petitioner objects that during closing argument the

2 prosecution mischaracterized the shoes petitioner allegedly carried out of Copeland's.  (Am. Pet.

3 at 52.)  Petitioner contends that he described the shoes in his possession when he left Copeland's

4 had "multiple colors," citing RT 402-14.  (Am. Pet. at 52.)  But there is no description of the

5 shoes in RT 402-14.  The property receipt submitted by petitioner describes the color of the shoes

6 as "W/Blu/SL."  (Pet.'s Ex. K.)

7      At trial, petitioner testified that the shoes he allegedly brought into Copeland's

8 were black with zippers.  (RT 422.)  But the prosecution argued that the videotape from

9 Copeland's showed the shoes petitioner left with were white.  (RT 500, 523.)  The jury was

10 shown the videotape and thus could decide whether the video displayed the color of the shoes

11 pictured in petitioner's possession.  However, because the property receipt reflects that the shoes

12 had some white color to them, it is likely that any objection raised by defense counsel would

13 have been overruled.  Accordingly, this court cannot find defense counsel was ineffective for

14 failing to object.

15      On a related matter, in his traverse, petitioner raises, for the first time, a claim that

16 defense counsel was ineffective for failing to object to the prosecution's narration of the

17 videotape stating petitioner exited the store with a different pair of shoes than he had entered the

18 store with.  (Traverse at 37-38.)  However, the record does not reflect that the prosecution

19 narrated the videotape, but merely argued about and commented upon the videotape.  The jury

20 was shown the videotape and were instructed that statements made by the attorneys during trial

21 are not evidence.  (CT 196.)  Here, the prosecution properly argued the evidence to the jury.  The

22 jury then rendered its verdict after considering all the evidence.  Defense counsel was not

23 ineffective for failing to object.

24      iii.  Failure to object to errors in the jury instructions

25      Petitioner alleges defense counsel was ineffective for failing to object when the

26 trial court did not also instruct the jury with instructions on the crime of theft by false pretenses,

1    specifically CALJIC 14.10, 14.11 and 14.14.  Petitioner argues that counts 3 through 7 were

2    actually crimes of theft by false pretenses and therefore the jury should have been so instructed.

3          Subclaim three was rejected by the Sacramento County Superior Court as being

4    successive and for not being raised on appeal (Resp.'s Answer, Exs. M, Q), and the California

5    Supreme Court without comment (Resp.'s Answer, Ex. U.)  Thus, there is no reasoned state

6    opinion as to claim three and the court has reviewed this claim de novo.

7          There was sufficient evidence to support the jury's verdict of guilt on the felony

8    charge of unlawful entry into a commercial building with the intent to commit larceny.[9]

9    Accordingly, it cannot be said that the trial court's failure to provide the false pretenses

10   instruction violated petitioner's right to due process, much less resulted in actual prejudice under

11   Brecht, 507 U.S. at 637.  See Duckett, 67 F.3d at 745.

12          iv.  Failure to submit a motion to bifurcate the charges against petitioner

13          Petitioner contends defense counsel was ineffective because he failed to move to

14   bifurcate all twelve of petitioner's consolidated counts.  (Am. Pet. at 54.)

15          Claim four was not presented to the California Supreme Court or any other state

16   court.  Notwithstanding petitioner's apparent failure to exhaust this claim, the court has reviewed

17   this claim de novo, and will recommend denial of this claim.  28 U.S.C. 2254(b)(2)("An

18   application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure

19   of the applicant to exhaust remedies available in the courts of the State.")

20   /////

21

22          [9]  In California, the common law crimes of larceny, embezzlement, obtaining money by
     false pretenses and kindred offenses have been consolidated by the provisions of Cal Pen Code
23   § 484.  See Callan v. Superior Court of San Mateo County, 204 Cal.App.2d 652, 22 Cal.Rptr.
     508 (1962).  Under Cal Pen Code § 484, there is simply one consolidated crime of theft.  Id. The
24   jury may therefore enter a verdict of guilty upon any theory of theft, as long as there is sufficient
     evidence of an unlawful taking.  People v. Counts, 31 Cal.App.4th 785, 793, 37 Cal.Rptr.2d 425
25   (1995).  In addition, "[e]very person who enters any house, room, apartment, tenement, shop,
     warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel . . . with intent to
26   commit grand or petit larceny or any felony is guilty of burglary . . . ."  Cal. Penal Code § 459.

1          There is no evidence that the trial court was inclined to grant a motion to bifurcate

2    had defense counsel so moved.  The court had wide discretion to consolidate these counts.  Even

3    if defense counsel had moved to bifurcate the counts and the motion had been granted, petitioner

4    has not demonstrated it is reasonably probable the jury would have reached a more favorable

5    verdict on any of the counts.  As discussed below, there was sufficient evidence on all twelve

6    counts.  This court cannot find defense counsel ineffective for failing to file such a motion.

7          E.  Fourth Claim

8          Petitioner's fourth claim is that he received ineffective assistance of appellate

9    counsel because he failed to raise certain claims on appeal.

10          No state court rendered a reasoned opinion concerning this claim.  The

11   Sacramento County Superior Court denied the claim on the procedural ground that the claim had

12   not been raised on direct appeal.  (Resp.'s Answer, Ex. Q.)  The California Supreme Court

13   denied the claim without comment.  (Resp.'s Answer, Ex. U.)

14          The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

15   v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

16   However, an indigent defendant "does not have a constitutional right to compel appointed

17   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

18   professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

19   (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

20   ability of counsel to present the client's case in accord with counsel's professional evaluation

21   would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

22   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

23   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

24   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

25   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

26   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

1   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

2   prevailed on appeal. Miller, 882 F.2d at 1434, n.9.

3          Petitioner essentially faults appellate counsel for failing to raise all of the claims

4   of error petitioner incorporated from his ineffective assistance of trial counsel section of his

5   amended petition. However, the court has reviewed those claims and found petitioner failed to

6   meet the prejudice prong of Strickland. Because petitioner's claims lack merit, petitioner cannot

7   demonstrate Strickland prejudice of appellate counsel on those claims either. Petitioner's fourth

8   claim for relief should be denied.

9          F. Sixth Claim

10          Petitioner's sixth claim is that there was insufficient evidence to convict him of

11   petty theft and second degree burglary in counts one through seven, eleven and twelve.

12          The Sacramento County Superior Court denied this claim on procedural grounds

13   as being successive and not being raised on appeal and with regard to counts one and two, on the

14   grounds that the claims were raised and rejected on appeal. (Resp.'s Answer, Ex. Q.) The

15   California Supreme Court denied the claim without comment.[10] (Resp.'s Answer, Ex. U.)

16   Thus, there is no reasoned rejection of this claim by a state court.

17          The Due Process Clause of the Fourteenth Amendment "protects the accused

18   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

19   constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There

20   is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

21   favorable to the prosecution, any rational trier of fact could have found the essential elements of

22   the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also

23

24         [10] Petitioner raised a sufficiency of the evidence claim on direct appeal, but it differs in

25   substance from the one presented to the superior court and the California Supreme Court as well as the instant petition, so the court does not rely on the opinion rendered on petitioner's direct

26   appeal by the Third District Court of Appeal. (Compare Ex. A to Exhibits P & T to Respondent's Answer filed December 1, 2004.)

1   Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "[T]he dispositive question

2   under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

3   a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,

4   443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

5   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

6   process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).

7          The court must review the entire record when the sufficiency of the evidence is

8   challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

9   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

10  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

11  reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

12  fact could draw conflicting inferences from the evidence, the court in its review will assign the

13  inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

14  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

15  the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

16  Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

17  reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors

18  reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

19  determines sufficiency of the evidence in reference to the substantive elements of the criminal

20  offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

21         Moreover, when criminal defendants take the stand in their own defense, a jury is

22  entitled to disbelieve the defendant's testimony, to discount his credibility on account of prior

23  felony convictions, and to take into account his demeanor when testifying.  Wright v. West, 505

24  U.S. 277 (1992).  And if the jury did disbelieve petitioner, the jury "was further entitled to

25  consider whatever it concluded to be perjured testimony as affirmative evidence of guilt

26  [citations omitted].  Wright, 505 U.S. at 296.

1      Here, petitioner challenges the evidence supporting his conviction of burglary and

2  petty theft with a prior.  In order to prove the crime of burglary, the following elements must be

3  proved, and the jury was so instructed:

4          1.  A person entered a building or store; and

5          2.  At the time of the entry, that person had the specific intent to
           steal and take away someone else's property and intended to
6          deprive the owner permanently of that property.

7          It does not matter whether the intent with which the entry was
           made was thereafter carried out.
8

9  (RT 480, citing Cal. Penal Code Section 459.)

10      In order to prove the crime of petty theft with a prior, each of the following

11  elements must be proved, and the jury was so instructed:

12          1.  A person committed a petty theft in that he took and carried
           away the personal property of another person with the specific
13          intent to permanently deprive the owner of such property; and

14          2.  That person, prior to committing the petty theft, had been
           convicted of robbery and had served a term for such conviction in a
15          penal institution.

16          A state prison is a penal institution.

17          To constitute, "carrying away," the property need not be actually
           removed from the place or premises where it was kept, nor need it .
18          . . be retained by the perpetrator.

19          A person who takes an item from a store display with the intent to
           claim ownership and return it to the store only on condition that the
20          store pay him or her a "refund," has the intent to permanently
           deprive the store of that item.
21
           In the crimes charged in Counts 1 through 9 and 10 and 11, there
22          must exist a union or joint operation of act or conduct and a certain
           specific intent in the mind of the perpetrator.  Unless this specific
23          intent exists, the crime to which it relates is not committed.

24  (RT 481-82.)

25      On counts one and two, petitioner contends the evidence was insufficient because

26  pictures of the bike reflected two inflated tires, not a flat tire, and no tools were found near the

33

1    bike to show petitioner could have used the allegedly stolen bike tube to fix the alleged flat tire.

2    (Am. Pet. at 58.)  Petitioner contends Bing Haas was the only witness and had reason to lie about

3    what happened.  (Id.)

4            However, at trial, Bing Haas testified as to his prior experiences with petitioner in

5    the store.  (RT 100-03, 131-32, 134.)  Haas saw petitioner in September 1996 in the middle of

6    the store with nothing in his hands and heading to a corner of the store.  (RT 99-100, 152-55.)

7    Based on his prior experiences with petitioner, Haas followed petitioner.  (RT 100, 131, 136.)

8    While in the bike accessories aisle, Haas used a hand-held mirror and saw petitioner take a bike

9    tire tube in a blue box and put it down the front of petitioner's pants.  (RT 103-05, 138-39.)  Haas

10   watched petitioner exit the store into the parking lot and remove the tire tube from his pants.  (RT

11   106-07.)  At that point, Haas and some employees ran out of the store and Haas yelled "Stop."

12   (RT 107.)  Petitioner got on his bike, then got off the bike and started running.  (RT 107.)  Haas

13   testified that the bike had a flat back tire and a pouch that contained some tools and a letter

14   addressed to petitioner and postmarked September 23, 1996.  (108-10; 132-34, 143.)  Petitioner

15   testified that he did not enter the store that day and that his bike had been stolen from the bike

16   rack located in the same shopping plaza as the Rite-Aid (then Payless) store.  (RT 362-65, 427.)

17           As to count three, petitioner contends that the record does not make clear under

18   what theory petitioner was being charged – for the white envelopes allegedly secreted in the front

19   of his pants or the alleged attempt to obtain a refund for the larger envelopes presented at the

20   checkstand.  (Am. Pet. At 59.)

21           The record reflects the following.  On count three, Bing Haas testified that on

22   August 9, 1998, he saw petitioner enter the store, go to the housewares aisle and place something

23   in the front of petitioner's pants.  (RT 111-12, 155-56, 184-85.)  Petitioner proceeded to the

24   stationery aisle where he selected a packet of large envelopes and went to the check out stand.

25   (RT 113-14.)  Petitioner set down the envelope, had a receipt, and said to the cashier, "You know

26   the drill."  (RT 114.)  At that point, Haas stepped to the register and said, "No refund today,

34

1   Curtis Penn." (RT 114.) Petitioner responded, "Who is Curtis Penn?" (Id.) Haas responded by

2   saying, "Curtis Penn is a friend of mine," and took the envelopes from petitioner. (RT 115.)

3   Petitioner said he was going to buy the envelopes but he had not taken any money out. Petitioner

4   contended Haas intervened before petitioner could do so. (RT 113-14, 119-20, 155-59, 162, 165-

5   66, 169-70, 185.) The receipt petitioner had was from the Fulton store but matched the

6   envelopes petitioner had brought to the checkstand. (RT 115.) Petitioner left and Haas asked the

7   security guard to take down petitioner's car license number. (RT 116.)

8         Petitioner denied he had put anything down the front of his pants. (RT 369.)

9   Petitioner denied saying "You know the drill," testifying he said "You know the deal," which

10   meant he would use a Rite Aid debit card to pay for the envelopes. (RT 367-70.) Petitioner

11   testified that he went to reach for his wallet when Haas intervened. (RT 363.) Petitioner denied

12   asking the cashier for a refund. (RT 371.) Petitioner testified it was his intent to purchase the

13   envelopes. (RT 371.) Petitioner testified he asked both the cashier and Haas for the manager's

14   number to complain about how he was being treated. (RT 372-73.)

15         As to counts four and five, petitioner argues that neither Roddell nor Stephenson

16   observed petitioner enter the store without pet products or water in his possession. (Am. Pet. At

17   61.) Petitioner notes Stephenson failed to produce any video confirming he entered the store

18   empty-handed. (Id.) Petitioner contends the prosecution failed to provide evidence of ownership

19   of the pet products and Aquafina bottle in question, thus failing to prove petitioner carried away

20   the items. (Am. Pet. At 62.) Petitioner contends that Stephenson's testimony that he did not

21   know if the Aquafina water bottle actually came from his store that day or any other day (RT

22   266-67) demonstrates there was insufficient evidence to find him guilty of taking the water

23   bottle. (Am. Pet. At 62.)

24         The record reflects that on August 10, 1998, petitioner entered the Lucky's store,

25   went to Henry Roddell's checkstand, and attempted to obtain a refund for a number of pet

26   products. (RT 232-33.) While the items were carried by that Lucky's store, they did not match

1   petitioner's receipt, which was for purchases from that store.  (RT 233-36; 241.)  Petitioner had a

2   cold and unopened bottle of Aquafina water with him at the checkstand.  (RT 234-35.)  He

3   opened the seal and took a drink.  (RT 234-35.)  Roddell told petitioner the items did not match

4   the receipt and petitioner responded by stating he had purchased the items there and wanted a

5   refund.  (RT 236.)  Petitioner "became nervous and jittery, as if he was in a hurry."  (RT 237.)

6   Roddell called Paul Stephenson who confirmed that the items did not match the receipt.  (RT

7   236-37; 247-48.)  Petitioner became aggressive toward Stephenson and acted like he wanted to

8   leave the store.  (RT 237-38.)  Petitioner said he and his wife had purchased the items and

9   decided they didn't need them.  (RT at 247.)  Petitioner then left the store with the items.  (RT

10  238.)  Roddell called Stephenson and told him petitioner was leaving the store with the items.

11  (RT 249.)  Stephenson followed petitioner out of the store and saw petitioner throw the items in

12  the trash.  (RT 250.)  Stephenson confronted petitioner, told him he was suspected of theft and to

13  return to the store.  (RT 250-51.)  Petitioner asked Stephenson what he would do if petitioner did

14  not return to the store.  (RT 251-52.)  Stephenson told petitioner he would call the sheriff.  (RT

15  252.)  Petitioner threw the bottle of water and said, "If you touch me, I'm going to kick the shit

16  out of you."  (RT 252.)  Stephenson went into Petco and dialed 911.  (RT 252-53.)  Stephenson

17  testified he did not have the expertise required to obtain a copy of any video of the above and did

18  not ask someone who did in time to retain a copy of the events of August 10.  (RT 270-71.)

19          On cross-examination, Stephenson confirmed he had witnessed petitioner break

20  the seal of the Aquafina water bottle, but that neither he nor Roddell had seen petitioner pick up

21  the bottle at the store that day.  (RT 266-67.)  Stephenson didn't see petitioner remove items

22  from the store shelves that day either.  (RT 267.)

23          Petitioner testified that his ex-girlfriend bought the items but that because they got

24  rid of their pets they no longer needed the pet products.  Because the products were only worth

25  about $10.00, he threw them in the trash because it was not worth the trouble because there was

26  /////

36

1    obviously something wrong with the receipt.  Petitioner denied trying to steal the items.  (RT
2    391-01.)

3              Petitioner also challenges Stephenson's testimony with regard to counts 6 and 7,
4    noting he testified that he did not know the "nature of the transaction."  (Am. Pet. at 62, citing
5    RT 272-73.)  Petitioner argues that the prosecution's failure to call Rachel Sandoval, Gloria and
6    Steve Hardin, who were material witnesses, renders the testimony of Stephenson insufficient.
7    (Am. Pet. at 62-63.) Petitioner contends inferences should not be drawn from speculation.  (Am.
8    Pet. at 64.)

9              Counts 6 and 7 were based on petitioner's conduct on August 12, 1998 at the
10   same Lucky's store.  During a hearing on whether the videotape of the incident would be
11   admitted to the jury, Stephenson testified that he saw petitioner enter the store.  (RT 222.)
12   Stephenson notified a grocery manager and told him, "Look, this is a guy that I had an incident
13   before with . . . .  You better catch him on camera."  (RT 222.)   Stephenson saw petitioner had a
14   bottle of Kahlua.  (RT 215.)  Stephenson was at the register and petitioner was standing at the
15   service center.  (RT 215.)  Stephenson testified that he had watched all the video of petitioner in
16   the store that day, but had not prepared the video being presented for admission here.

17             During cross-examination, defense counsel inquired why the times on the cameras
18   differed.  (RT 224.)  Stephenson initially could not explain the variance in time.  (RT 224.)
19   However, after reviewing the tape again, Stephenson explained the larger gap was based on
20   petitioner entering the store's east door, then exiting the store, then walking around and entering
21   the store's front entrance.  (RT 227.)  He testified that the time difference was about that required
22   to walk from the east side around to the front of the store.  (RT 227.)  Defense counsel moved
23   that the tape not be played for the jury because there was insufficient indicia of reliability, no
24   sufficient foundation and no authentication.  (RT 228-29.)  The trial court was concerned about
25   the two times, but noted "it doesn't seem to have much significance as to which time is right."
26   (RT 229.)  The trial court held that although the video was out of order, the jury could put it

together like a jigsaw puzzle.  (RT 229.)  "It does have some indicating of coming into the store

empty-handed."  (RT 229.)  The court ruled the video was admissible.  (RT 230.)

The jury returned to the courtroom and Stephenson testified that he first saw

petitioner on August 12, 1998, walking behind Stephenson, headed toward the customer service

counter.  (RT 255.)  Petitioner was carrying a bottle of Kahlua.  (RT 256.)  Stephenson was

working at a checkstand.  (RT 256.)  Stephenson recognized petitioner from the events on August

10, and informed the grocery manager, Steve Hardin, that they had a report for a possible theft

but were unable to locate petitioner, and suggested Hardin contact the Sheriff's Department.  (RT

256.)  Stephenson explained the store policy that any refund over $9.99 requires a manager's

override.  (RT 257.)  Rachel Sandoval was assisting petitioner and sought a manager's override.

(RT 257.)  Gloria, the bookkeeper, provided the override, and Stephenson saw Rachel give

petitioner cash and watched him leave the store.  (RT 258.)

Stephenson explained how the store's videotapes work and the video was played

for the jury.  (RT 259.)  During the playing of the tape, the prosecution paused at certain points

and asked Stephenson to explain what is happening.  (RT 262-64.)  Stephenson noted that Rachel

had her hand in the cash drawer.  (RT 262.)  After that, petitioner exited the store.  (RT 262.)

Stephenson explained that petitioner was retrieving a bottle of Kahlua.  (RT 263.)  Stephenson

testified that the refund receipt entered into evidence was the receipt from the transaction at issue

and reflected "MO," or manager's override.  (RT 265.)

On cross-examination, Stephenson testified that he wasn't watching petitioner the

entire time petitioner was in the store, but would "constantly look back and see what was going

on."  (RT 272.)  Stephenson testified he was about thirty feet from petitioner.  (RT 272.)

Stephenson admitted that the videotape resolution was not high quality so he could not determine

what item petitioner selected from the store's shelf or what aisle petitioner was in at the time.

(RT 274-75.)  The prosecution pointed out the variances in time on the tape.  (RT 275-77.)

/////

Petitioner also challenges counts eleven and twelve, contending there was insufficient evidence to demonstrate his specific intent upon entering Copeland's because at the time he entered Copeland's he did not know he would find a pair of tennis shoes he liked better than the pair he had purchased the previous day.  (Am. Pet. At 65.)

As to counts eleven and twelve, the record reflects the following:[11]

On September 24, 1998, at approximately 4:00 p.m., Sally Halder was working at the main cash register of the Copeland Sports store at Downtown Plaza. [Petitioner] entered carrying a small Macy's shopping bag.  Nothing else was in his hands.  [Petitioner] set the bag by the side of Halder's register, said nothing, and proceeded to the men's shoe department.  Halder next saw [petitioner] come to her register with a Reebok shoe box, which he put off the side.  He said nothing and went back to the shoe department.

Halder opened the box, took out the shoes, and looked for security sensors on the shoes; there were none.  She then put the shoes back in the box.

[Petitioner] returned to Halder's register and set the Macy's bag on top of the Reebok shoe box.  He told her that he had bought the shoes at the Arden store the night before, that he had looked for another pair or size, and that he decided not to exchange the shoes. [Petitioner] picked up the shoe box and the Macy's bag and left the store with the box and bag.

Ryan McLucas, an asset protection agent, was in the video camera monitoring room while [petitioner] was in the shoe department. [Petitioner] was seen talking to a store employee and was next seen with a Reebok shoe box.  He sat at the "try-on bench," removed a shoe from the box, looked left and right, went between two aisles, and made a jerking or pulling movement with his right arm.  He returned to the try-on bench and put the shoe back in the box. Copeland has security sensors on its shoes; they are attached with a pin through the tongue or eyelet of the shoe but can be forcibly removed. [Petitioner] took the other shoe out of the box, looked around, and pulled the sensor tag off of that shoe.  He put the tag on a shelf, put the shoe in the box, took the shoe to the front of the store, put it on the register table, and appeared to speak to Sally Halder.  [Petitioner] left Halder and walked around the shoe department.  He returned to the register, got a bag and the shoe box and exited.

/////

_____

[11] <u>People v. Penn</u>, slip opin. 8-10.

McLucas ran after [petitioner], contacted him outside the store, identified himself as store security, and told him to put down the bag and box and put his hands on his head. [Petitioner] complied, but when McLucas went to handcuff him, he broke free and ran. He was later tackled, handcuffed, and held until law enforcement arrived.

The video tape of the incident was played for the jurors.

[Petitioner] testified he went to the Downtown Plaza to compare prices between that Copeland store and the Copeland store on Arden. He entered with a Macy's bag and a box of Reebok shoes that he had bought the day before at the Arden store. The shoes he brought into the store were black with zippers. While in the men's shoe department, he got a pair of shoes and removed the sensor tags because he wanted the shoes but did not want to pay the difference in price. He put the shoes back in the box, took them to the front register and put the box next to the bag he brought in, saying nothing to Halder. He walked around the store, decided not to make the switch, returned to Halder's register, put his Macy's bag on top of the shoe box he had brought into Copeland's, told Halder he decided to keep the shoes he came in with, and exited.

People v. Penn, slip opin. at 8-10.

The testimony of Bing Haas was sufficient to support the conviction on counts one and two, and three. The testimony of Stephenson and Roddell was sufficient to support petitioner's conviction on counts four and five. The testimony of Stephenson and the videotape were sufficient to support petitioner's conviction on counts six and seven. The testimony of Sally Halder (RT 294-305) and Ryan McLucas (RT 310-335), and the videotape were sufficient to support petitioner's conviction on counts eleven and twelve. In light of this evidence, a rational juror could reach the conclusion the jury reached here. Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). This evidence, under California law, was sufficient to meet the substantive elements required. Petitioner took the stand in his own defense and the jury was entitled to weigh his credibility against that of the other witnesses. The court must presume the jury resolved any conflicts in favor of the prosecution and must defer to that resolution. Jackson, at 326.

/////

1         The jury was instructed that the crimes of petty theft with a prior and second

2  degree burglary required the jury to find that the proved circumstances were consistent with the

3  theory that petitioner had the required specific intent and that it could not be reconciled with any

4  other rational conclusion.  (RT 474.)  The jury was properly instructed as to the inferences that

5  could be raised by the flight of a person immediately after the commission of a crime or after he

6  is accused of a crime.  (RT 477-78.)

7         The record here reflects there was sufficient evidence to support convictions for

8  petty theft and second degree burglary in counts one through seven, eleven and twelve.

9  After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

10  could have found the essential elements of the crimes beyond a reasonable doubt.  Thus,

11  petitioner's sixth claim for relief should be denied.

12         G.  Seventh Claim

13         Petitioner's seventh claim is that the trial court committed reversible error by

14  denying defense counsel's motion to exclude evidence of other crimes.

15         The Sacramento County Superior Court denied this claim on procedural grounds

16  as being successive and not being raised on appeal.  (Resp.'s Answer, Ex. Q.)  The California

17  Supreme Court denied the claim without comment.  (Resp.'s Answer, Ex. U.)

18  Thus, there is no reasoned rejection of this claim by a state court.

19         The question whether evidence of prior uncharged acts was properly admitted

20  under California law is not cognizable in this federal habeas corpus proceeding.  Estelle v.

21  McGuire, 502 U.S. 62, 67 (1991).  The only question before this court is whether the trial court

22  committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated

23  federal due process.  Id.  See also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991)

24  ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or

25  absence of a state law violation is largely beside the point").  A writ of habeas corpus will be

26  granted for an erroneous admission of evidence "only where the 'testimony is almost entirely

1   unreliable and . . . the factfinder and the adversary system will not be competent to uncover,

2   recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F. 3d 939, 956

3   (2002)(quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983).  Evidence violates due process

4   only if "there are no permissible inferences the jury may draw from the evidence." Jammal, 926

5   F. 2d at 920.  Even then, evidence must "be of such quality as necessarily prevents a fair trial."

6   Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

7           Under Ninth Circuit law, the admission of "other acts" evidence violates due

8   process only if there were no permissible inferences the factfinder could have drawn from the

9   evidence.  See McKinney v. Rees, 993 F.2d 1378, 1381 (9th Cir. 1993) (question is "whether any

10  inferences relevant to a fact of consequence may be drawn from each piece of the evidence, or

11  whether they lead only to impermissible inferences about the defendant's character"); Jammal,

12  926 F.2d at 920 ("[e]vidence introduced by the prosecution will often raise more than one

13  inference, some permissible, some not; we must rely on the jury to sort them out in light of the

14  court's instructions").  See also United States v. LeMay, 260 F.3d 1018, 1027 (9th Cir. 2001)

15  (evidence of prior similar crimes "will only sometimes violate the constitutional right to a fair

16  trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it

17  might have").

18          During pretrial motions on September 22, 1999, defense counsel moved to

19  exclude multiple receipts from different retail establishments discovered in petitioner's pocket

20  during his arrest at Copeland's.  (RT 23-24.)  Defense counsel argued the receipts were

21  irrelevant; the prosecution argued they were probative on the issue of common plan or scheme as

22  well as intent.  (RT 24-25.)  The trial court found the evidence relevant to petitioner's "intent for

23  which he may or may not have entered those stores on August 9th, 10th, 12th, and 15th," and

24  held the evidence admissible.  (RT 25.)

25          The receipts discovered in petitioner's pocket during his arrest at Copeland's,

26  although not involved with the transaction at Copeland's, provided evidence of a common

1  scheme or plan by petitioner that he would find receipts and use them to return items for which

2  he had not paid.  The charges at issue in this case involved petitioner's intent to enter stores and

3  return items for which he had not paid.  Thus, the receipts found in petitioner's pocket were

4  relevant to show petitioner's intent on the days he entered the stores on the days at issue here.

5  Thus, these receipts were relevant to petitioner's intent on the days of the charged offenses, as

6  well as to his common plan or scheme to obtain receipts to return items for money.  Because

7  these are permissible inferences a jury could draw from this evidence, <u>McKinney</u>, 993 F.2d at

8  1384, the admission of this evidence did not render petitioner's trial fundamentally unfair.  This

9  claim should also be denied.

10          H.  <u>Eighth Claim</u>

11          Petitioner's eighth claim is that the trial court committed reversible error in

12  admitting evidence of prior theft-related convictions.

13          The Sacramento County Superior Court denied this claim on procedural grounds

14  as being successive and not being raised on appeal.  (Resp.'s Answer, Ex. Q.)  The California

15  Supreme Court denied the claim without comment.  (Resp.'s Answer, Ex. U.)  Thus, there is no

16  reasoned rejection of this claim by a state court.

17          As noted above, absent some federal constitutional violation, a violation of state

18  law does not provide a basis for habeas relief.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

19  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas

20  relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

21  <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78

22  (9th Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  In addition, in

23  order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error

24  was not harmless under <u>Brecht</u>.  <u>Dillard v. Roe</u>, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

25  Therefore, in order to grant relief, the habeas court must find that the error had "'a substantial and

26  injurious effect' on the verdict." <u>Brecht</u>, 507 U.S. at 623.

1          During pretrial motions on September 22, 1999, the prosecution moved to

2    impeach petitioner with the 1994 and 1995 petty theft with a prior convictions, a 1995 false

3    identification to officer conviction, and the three 1991 convictions for robbery and attempted

4    robbery.  (RT 16.)  Defense counsel moved to preclude the specific nature of the felony

5    convictions, arguing the nature of the crimes was similar to the instant charges, and arguing that

6    the prejudice to petitioner outweighed the probative value of that evidence, citing California

7    Evidence Code § 352.  (RT 17.)  Defense counsel also moved to preclude admission of the

8    underlying conduct supporting the 1991 convictions because the similarity to the charged

9    conduct would cause the jury to view it as propensity evidence, unduly prejudicing petitioner.

10   (RT 18.)  Defense counsel also asked the court to sanitize the 1991 convictions to reflect that

11   petitioner committed crimes of dishonesty.  (RT 19.)  The prosecution countered that the

12   robberies were sufficient dissimilar to the instant conduct such that there was no need to sanitize

13   the convictions.  (RT 19.)

14          The trial court allowed impeachment based on the three 1991 felony convictions,

15   finding the underlying conduct dissimilar to the offenses charged, noted that if the convictions

16   were just referred to as felony convictions the jury would speculate, and found the probative

17   value outweighed the prejudice to petitioner.  (RT 20.)  As for the 1994, 1995 and 1995

18   misdemeanor charges, the court found the cumulative effect would cause the prejudice to

19   petitioner to outweigh its probative value.  (RT 20.)  The court held that the conduct from the

20   1994 and 1995 convictions for petty theft should not be told to the jury and not be used for

21   impeachment.  (RT 21.)  The 1995 false identification conviction was similarly barred from

22   admission.  (RT 21.)  Thus, petitioner could only be impeached with felony convictions.  (Id.)

23          However, on September 28, 1999, the information, which included reference in

24   counts seven and twelve to petitioner having been previously convicted of petty theft with a prior

25   /////

26   /////

44

1  in 1994, was read to the jury.  (RT at 76-80.)[12]  Defense counsel did not object and did not move

2  for a mistrial.  (Id.)

3          On September 29, 1999, the court granted the prosecution's motion to amend the

4  information as to counts seven and twelve to refer to the 1991 robbery priors rather than the 1994

5  petty theft with a prior.  (RT 336.)  On October 4, 1999, the court instructed the jury and read the

6  amended information to the jury.  (RT 462-70.)

7          Petitioner contends that the trial court erred by referring to the 1994 prior

8  conviction of petty theft with a prior and that those references "clearly prejudiced the minds of

9  the jury."  (Am. Pet. at 76.)

10          The Ninth Circuit Court of Appeals has explained the operation of petty theft with

11  a prior under California Penal Code § 666:

12          In California, the crime of larceny or theft is classified as either
            grand theft or petty theft. P.C. § 486. Generally, grand theft is theft
13          of property valued at more than $400, P.C. § 487, and all other
            theft is petty theft. P.C. § 488. Petty theft is usually a misdemeanor,
14          punishable by fine or imprisonment in the county jail not
            exceeding six months, or both. P.C. § 490. However, if an
15          individual convicted of petty theft has a prior theft-related
            conviction for which he served a term in a penal institution, he may
16          be convicted of violating P.C. § 666, which provides for enhanced
            penalties, including the possible treatment of the conviction as a
17          felony for sentencing purposes.[13]

18  ───────────────

19          [12]  Count seven read as follows:  "Another violation of Section 666 of the Penal Code,
            alleging that on August 12, 1998, the [petitioner] did unlawfully steal, take and carry away
20          alcohol, the personal property of another, to wit, Lucky Grocery Store, the [petitioner] having
            been previously convicted of a crime of petty theft with a prior on March 7, 1994, in the
21          Municipal Court of the Sacramento Judicial District of the State of California, having been
            imprisoned therein as a condition for said offense."  (RT 78.)  Count twelve contained a similar
22          reference to the March 7, 1994 prior.  (RT 79-90.)

23          [13]  By its terms, P.C. § 666 provides:  "Every person who, having been convicted of petty
            theft, grand theft, auto theft under Section 10851 of the Vehicle Code, burglary, carjacking,
24          robbery, or a felony violation of Section 496 and having served a term therefor in any penal
            institution or having been imprisoned therein as a condition of probation for that offense, is
25          subsequently convicted of petty theft, then the person convicted of that subsequent offense is
            punishable by imprisonment in the county jail not exceeding one year, or in the state prison."
26          P.C. § 666 (West 2000).

1        Although a violation of P.C. § 666 is often referred to as the
substantive crime of "petty theft with a prior," the California
2    Supreme Court, in People v. Bouzas, 53 Cal.3d 467, 279 Cal.Rptr.
847, 807 P.2d 1076 (1991), held P.C. § 666 "is structured to
3    enhance the punishment for violation of other defined crimes and
not to define an offense in the first instance." Id. at 478, 279
4    Cal.Rptr. at 855, 807 P.2d 1076; see also People v. Tardy, 112
Cal.App.4th 783, 787, 6 Cal.Rptr.3d 24, 27 (2003) ("[P.C.] section
5    666 does not establish a separate, substantive 'crime' of petty theft
with a prior conviction[.]"); United States v. Corona-Sanchez, 291
6    F.3d 1201, 1206 (9th Cir.2002) (citing Bouzas for proposition P.C.
§ 666 "is a pure sentencing statute"). Based upon this distinction,
7    the California Supreme Court concluded "the prior conviction and
incarceration requirement of [P.C.] § 666 is a sentencing factor for
8    the trial court and not an 'element' of the [P.C.] section 666
'offense' that must be determined by a jury." Bouzas, 53 Cal.3d at
9    480, 279 Cal.Rptr. at 856, 807 P.2d 1076. Accordingly, under
Bouzas, a defendant charged with violating P.C. § 666 or petty
10   theft with a prior has "the right to stipulate to the prior conviction
and incarceration and thereby preclude the jury from learning of
11   the fact of his prior conviction." Id. (emphasis added).

12 Bowen v. Giurbino, 305 F.Supp.2d 1131, 1136 (2004).  In addition, California law provides that:

13      The jury having been impaneled and sworn, unless waived, the trial
shall proceed in the following order, unless otherwise directed by
14   the court:

15       (a) If the accusatory pleading be for a felony, the clerk shall read
it, and state the plea of the defendant to the jury, and in cases
16   where it charges a previous conviction, and the defendant has
confessed the same, the clerk in reading it shall omit therefrom all
17   that relates to such previous conviction. In all other cases this
formality may be dispensed with.

18

19 Cal. Penal Code § 1093.

20       "The admission of 'other acts' evidence, which a defendant contends is unduly

21 prejudicial, will violate due process only when there are no permissible inferences the jury may

22 draw from the evidence." Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir.1998)(quoting

23 Jammal, 926 F.2d 918, 920 (9th Cir.1991); Houston v. Roe, 177 F.3d 901, 910 n.6 (9th

24 Cir.1999), cert. denied, 528 U.S. 1159 (2000).  Here, there were no permissible inferences the

25 jury could have taken from the evidence of petitioner's prior theft-related conviction, but only the

26 impermissible inference of criminal propensity.  Indeed, the trial court had previously ruled that

this evidence could not be admitted even for impeachment purposes because of the prejudicial

impact it would have on petitioner.  (RT 21.)  Accordingly, the admission into evidence of

petitioner's prior theft-related conviction was an error of constitutional magnitude.  See

McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir.)(finding "other acts" evidence which

supported only impermissible propensity inference constituted potential due process violation),

cert. denied, 510 U.S. 1020 (1993).

        Now the court must decide whether the error had a substantial and injurious effect

or influence in determining the jury's verdict.  Brecht, 507 U.S. at 623.  The Bowen v. Girubino

court held the errors in Bowen were not harmless:

> [G]iven that defense counsel's failure to object to the prosecutor's
> references to petitioner's prior conviction was prejudicial under
> Strickland, it follows a fortiori that the actual admission of the
> evidence was itself prejudicial under Brecht. See Kyles v. Whitley,
> 514 U.S. 419, 436 . . . (1995)(Strickland prejudice standard
> requires greater showing of harm to defendant than Brecht
> harmless-error standard); Pirtle v. Morgan, 313 F.3d 1160, 1173 n.
> 8 (9th Cir.2002) ("harmless error analysis under Brecht . . .
> involves a lower standard than Strickland's standard for
> prejudice"), cert. denied, 539 U.S. 916 . . . (2003).

>     Further, even if Strickland prejudice was not present in this case,
> the Court finds the error was not harmless. As discussed above, the
> evidence, while not presented in a particularly inflammatory way,
> was inherently prejudicial in nature. Further, the prejudicial impact
> of the evidence was not in any way mitigated by a limiting
> instruction. Crotts, 73 F.3d at 867; cf. Spencer, 385 U.S. at 563-64
> . . . (not violation of due process to admit "other crimes" evidence
> for purposes other than showing criminal propensity so long as jury
> is given proper limiting instructions). Finally, this is not a case in
> which the prejudicial evidence was only mentioned briefly during a
> long trial; rather, it was presented to the jury repeatedly throughout
> a short trial. See McKinney, 993 F.2d at 1386 (noting extent to
> which inadmissible character evidence was mentioned during trial).
> Thus, under the circumstances of this case, the Court finds that, at
> the very least, there is a "grave doubt" whether the repeated
> references to petitioner's prior conviction had a "substantial and
> injurious effect" on the jury's decision to convict petitioner of two
> theft-related offenses. O'Neal v. McAninch, 513 U.S. 432, 435 . . .
> (1995). In such a case, the error "is not harmless. And, the
> petitioner must win." Id. at 436 . . .; see also Payton v. Woodford,
> 346 F.3d 1204, 1217 (9th Cir.2003) (in performing Brecht/O'Neal
> analysis, government "bears the risk of doubt" (internal quotations

1   omitted)).  Thus, federal habeas relief is warranted on petitioner's
2   due process claims.

3   Bowen v. Giurbino, 305 F.Supp.2d at 1143-44.

4          However, the instant case is distinguishable from Bowen.  First, petitioner did not

5   stipulate to the fact of the 1994 prior conviction such that the trial court was required to omit

6   reference to it under California Penal Code § 1093.  Petitioner appears to be under the

7   misapprehension that he had stipulated to the fact of his prior convictions.  (Am. Pet. at 75.)

8   That is not the case.  The record reflects that petitioner pled not guilty to all charges and denied

9   all the allegations.  (CT 24, 125; RT 349; 452.)  The trial court also informed counsel that it was

10  the prosecution's burden to prove the fact of a prior prison commitment and that if the

11  prosecution could not prove it, that charge could not be deemed a felony.  (RT 15.)  Indeed, the

12  trial court properly decided that these theft-related priors could not be used as evidence or for

13  impeachment.  (RT 21.)

14         Second, in Bowen, the information containing reference to the theft-related prior

15  was read to the jury, the prosecution read the stipulation to the jury at the close of his case-in-

16  chief, and the prosecution mentioned the prior theft-related conviction twice during closing

17  argument.  Bowen, 305 F.Supp.2d at 1137-38.  Those errors were compounded by defense

18  counsel's failure to object and the trial court's use of jury instructions CALJIC Nos. 14.40 and

19  14.41, which are meant to serve as alternative choices based on whether or not the defendant

20  admitted the prior theft-related conviction.  Bowen, 305 F.Supp.2d at 1138.

21         By contrast here, the information was read once, on September 28, 1999 at the

22  beginning of trial, with two separate references to the prior theft-related conviction.  But then,

23  prior to close of evidence the next day, the prosecution moved to amend the information to

24  correct the reference to the 1991 felony convictions.  On October 4, 1999, the amended

25  information was read to the jury prior to deliberation.  There is nothing in the record to suggest

26  the jury was confused by the initial references to the 1994 conviction; the jury asked two

1  questions and asked for readback of testimony, but none of them addressed the 1994 conviction.

2  (CT 210-13.)

3         In addition, the jury was instructed with the variation of CALJIC 14.40 used when

4  a defendant had not stipulated to the prior theft-related convictions, and the jury instruction

5  accurately referred to petitioner's prior conviction for robbery.  (CT 203.)  There was no

6  reference to petitioner's prior conviction for petty theft with a prior.  (Id.)

7         For all of the above reasons, this court cannot find that the two references to the

8  1994 theft-related conviction during the initial reading of the information had a substantial and

9  injurious effect on the jury's verdict.  Accordingly, petitioner's eighth claim for relief should be

10 denied.

11         I.  Ninth Claim

12        Petitioner's ninth claim is that the trial court failed to instruct the jury on basic

13 principles of law required by the evidence presented.  Petitioner argues that the jury instructions

14 given were insufficient to prove the charges in counts 3 and 4 because the elements of fraud,

15 artifice or trick and device were required to prove the crime.  (Traverse at 57.)  Petitioner also

16 argues that the element of reliance was required to prove the crimes charged in counts 6 and 7.

17 (Id.)  The balance of the counts were properly instructed.  (Id.)

18        Respondent contends petitioner "is claiming that the jury should have been

19 instructed on crimes of which he was not charged."  (Answer at 56.)  "If the jury was instructed

20 as to theft by false pretenses, . . . [petitioner] may well have been found guilty on more than

21 twelve counts."  (Id.)

22        The Sacramento County Superior Court denied this claim on procedural grounds

23 as being successive and not being raised on appeal.  (Resp.'s Answer, Ex. Q.)  The California

24 Supreme Court denied the claim without comment.  (Resp.'s Answer, Ex. U.)  Thus, there is no

25 reasoned rejection of this claim by a state court.

26 /////

As noted above, a challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  A challenged jury instruction must violate some due process right guaranteed by the fourteenth amendment in order to warrant federal habeas relief.  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  Challenges based on a refusal or failure to give an instruction place a heavy burden on petitioner because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

The jury was properly instructed on counts 3, 4 and 6 on the elements of burglary.  (CT 202.)  The jury was properly instructed on count 7 on the elements of petty theft after he had previously been convicted of robbery and had served a term for that conviction in a penal institution.  (CT 203.)  As noted above, there was sufficient evidence to support these charges so there was sufficient evidence to prove intent under these two theories.  Respondent is correct that petitioner could have been charged with false pretenses as well.  The fact that the jury was not instructed on the crime of false pretenses, was proper since petitioner had not been charged with that crime.  But even if the jury had been instructed on false pretenses, the outcome would not have assisted petitioner.  It is more likely that petitioner would have been convicted of the crime of theft by false pretenses as well as the other charges.  See Watson v. Carey, 2007 WL 2670000 (N.D. Cal. 2007).  Petitioner's ninth claim for relief should be denied.[14]

/////

/////

_____

[14]  To the extent petitioner argues the trial court should have instructed on lesser-included offenses, such claim fails as well.  "Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."  Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir.1998).

J.   Tenth Claim

Petitioner's tenth claim is that the trial court erred by failing to instruct the jury, *sua sponte*, on a claim of right defense as to counts four and five.

The Sacramento County Superior Court denied this claim on procedural grounds as being successive and not being raised on appeal.  (Resp.'s Answer, Ex. Q.)  The California Supreme Court denied the claim without comment.  (Resp.'s Answer, Ex. U.)  Thus, there is no reasoned rejection of this claim by a state court.

To justify habeas relief, the failure to give an instruction must infect the entire trial, rendering it fundamentally unfair.  Estelle v. McGuire, 112 S.Ct. 475, 481-82 (1991). A trial court is required to give a particular instruction only if the evidence reasonably warrants it. Hopper v. Evans, 456 U.S. 605, 613 (1982).  A mere scintilla of evidence is insufficient.  United States v. Morton, 999 F.2d 435, 437 (9th Cir.1993).  The significance of the omission of an instruction is evaluated by a comparison of the omitted instruction with the instructions that were given.  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001) (quoting Henderson, 431 U.S. at 156).  Consequently, whether the failure to issue an instruction violates due process will depend on the evidence presented as well as the overall instructions received by the jury. Duckett, 67 F.3d at 745.

To determine whether due process was violated here, one must consider the claim-of-right defense as it existed under California law because state law defines the scope of the defense.  "The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery."  People v. Tufunga, 21 Cal.4th 935, 938 (Cal.1999).  The underlying rationale is that one cannot steal one's own property.  The claim of right defense can negate the intent to steal element of burglary, robbery, larceny or petty theft when the defendant acts "under the subjective belief that he or she has a lawful claim on property."  See People v. Romo, 220 Cal.App.3d 514, 518 (Cal.Ct.App.1990) (emphasis added).

1    Here, petitioner contends the trial court should have *sua sponte* instructed the jury

2  with jury instruction CALJIC No. 9.44:

3       An essential element of the crime of [robbery] [theft by larceny]
       is a specific intent permanently to deprive the alleged victim of his
4       or her property. That specific intent does not exist if the alleged
       perpetrator had a good faith claim of right to title or ownership of
5       the specific property taken from the alleged victim. In other words,
       if a perpetrator seeks to regain possession of property in which [he]
6       [she] honestly believes [he] [she] has a good faith claim of
       ownership or title, then [he] [she] does not have the required
7       criminal intent.

8       [However, the required criminal intent exists if, rather than
       seeking to recover specific property, the perpetrator is attempting
9       to satisfy, settle or otherwise collect on a debt, liquidated or
       unliquidated, and specifically intends permanently to deprive the
10      alleged victim of his or her property in furtherance thereof.]

11      If, after a consideration of all the evidence, you have a reasonable
       doubt that [defendant] [perpetrator] possessed the required specific
12      intent, you must find [him] [her] not guilty of the crime[s] of
       [robbery] [theft by larceny].

13

14  California CALJIC No. 9.44.

15    However, in the instant case, the jury was instructed with CALJIC No. 14.40,

16  which required the jury to find that petitioner took the property of another with the intent to

17  deprive the owner of the property.  The jury was instructed that the prosecution must prove that

18  petitioner had the specific intent to steal.  Petitioner took the stand and testified that his girlfriend

19  had purchased the products from a Lucky's store at Loehman's Plaza. (RT 381-83.)  However,

20  the receipt petitioner presented for the refund did not match the items presented.  Because the

21  jury had to find petitioner had taken property that rightfully belonged to someone else, the failure

22  to instruct with CALJIC 9.44 was not error under these circumstances.  While petitioner may

23  have been entitled to the jury instruction had defense counsel requested one, the trial court was

24  not under a duty to *sua sponte* instruct absent any request.

25    But even assuming, *arguendo*, the jury should have been so instructed, this court

26  cannot find that the failure to instruct on the claim of right defense had a substantial and injurious

1  impact on the verdict.  Brecht, 507 U.S. at 623.  Because the jury reasonably could have

2  concluded that petitioner was guilty, any error in failing to instruct on a "claim of right defense"

3  with respect to other theories of liability could not have had a substantial effect on the ultimate

4  verdict in this case.  See Brecht, 507 U.S. at 637.  In order for the jury to find petitioner guilty on

5  counts 4 and 5, the jury had to find that the dog food and water belonged to another.  Thus, the

6  omission of a jury instruction on claim of right did not render petitioner's trial fundamentally

7  unfair, in violation of the due process clause.  Accordingly, petitioner is not entitled to relief on

8  this jury instruction claim.

9         K.   Eleventh Claim

10        Petitioner's eleventh claim is that the prosecutor committed prosecutorial

11 misconduct.

12        The Sacramento County Superior Court denied this claim on procedural grounds

13 as being successive and not being raised on appeal.  (Resp.'s Answer, Ex. Q.)  The California

14 Supreme Court denied the claim without comment.  (Resp.'s Answer, Ex. U.)  Thus, there is no

15 reasoned rejection of this claim by a state court.

16        Success on a claim of prosecutorial misconduct requires a showing that the

17 conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

18 process.  Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to determine

19 "whether, considered in the context of the entire trial, that conduct appears likely to have affected

20 the jury's discharge of its duty to judge the evidence fairly."  United States v. Simtob, 901 F.2d

21 799, 806 (9th Cir. 1990).  Generally, if an error of constitutional magnitude is determined, a

22 harmless error analysis ensues.  Error is considered harmless if the court, after reviewing the

23 entire trial record, decides that the alleged error did not have a "substantial and injurious effect or

24 influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

25 Error is deemed harmless unless it "is of such a character that its natural effect is to prejudice a

26 litigant's substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).

1        Petitioner first contends that the prosecution prevented the defense from

2  interviewing witnesses who could have weakened prosecution's witnesses' testimony and

3  adduced material evidence.  Petitioner maintains the prosecution advised key witnesses not to

4  talk to the defense investigator without the district attorney's permission and not to divulge the

5  identities of other key witnesses to the defense.  (Am. Pet. At 90-91.)  Petitioner bases these

6  allegations on the defense investigator's declaration.

7        However, respondent has provided a declaration by the prosecution confirming

8  that he divulged all discoverable information to defense counsel, and that the prosecution merely

9  told Haas that it was his decision whether or not to speak to the defense or to the prosecution and

10  that he was not required to speak to anyone, including the prosecution.  (Resp.'s Answer, Ex. Z.)

11  The prosecutor confirmed that is what he tells all witnesses in criminal trials.  (Id.)  Moreover,

12  respondent points out that defense counsel argued concerning the failure of the prosecution to

13  call any other witnesses with respect to count one, using it to impeach the credibility of Haas,

14  particularly as to his failure to call the police and the fact he retained petitioner's bike for his own

15  personal use.  (RT 135-36, 139-41, 142-43, 150-51.)  Defense counsel also argued that there was

16  no corroboration of Haas' testimony.  (RT 504-05.)  Thus, the failure of the prosecution to call

17  these other witnesses did not have a substantial impact on the verdict.

18        Petitioner contends the prosecution committed prosecutorial misconduct by failing

19  to call the Rite Aid supervisor who waited on petitioner during the conduct charged in count

20  three, to testify as to whether petitioner actually said "You know the drill."  Petitioner argues,

21  without evidentiary support, that the prosecution "knew well in advance that this witness'

22  testimony would have helped [petitioner], and made it his duty not to reveal his name up until

23  trial."  (Traverse at 63.)

24        Petitioner has not provided a declaration by this Rite Aid supervisor confirming

25  that he would have testified favorably for petitioner.  Respondent has provided a declaration by

26  the prosecution stating that all discoverable information was disclosed to the defense.  (Resp.'s

1   Answer, Ex. Z.)  Moreover, the record reflects that Haas heard what petitioner said as he was

2   only twelve to fifteen feet away.  (RT 114.)  As petitioner points out, petitioner disputed what

3   was said as well as what was meant by what he said.  But the jury was entitled to hear Haas'

4   testimony concerning the exchange.  The testimony of the Rite Aid supervisor was not required

5   to prosecute the action.  If petitioner believed the testimony of the supervisor was necessary to

6   confirm petitioner's perception of the transaction, defense counsel could have called the

7   supervisor to testify.  The fact that petitioner was convicted on count three demonstrates that the

8   testimony of the supervisor was not key to the prosecution's case.  Petitioner's claim of

9   prosecutorial misconduct with regard to count three fails.

10          With regard to counts six and seven, petitioner argues that the prosecution failed

11   to provide the names of Rachel Sandoval, Gloria, the bookkeeper, and Steve Hardin to defense

12   counsel, again relying on the defense investigator's report.  Petitioner also contends Stephenson

13   had moved to Tahoe City and would not return the defense investigator's phone calls.

14          The defense investigator's report, however, does not raise an inference that the

15   prosecution failed to turn over these names.  Although the defense investigator was unable to

16   contact Stephenson, nothing precluded him from contacting the current manager of the Lucky's

17   store Stephenson had worked at in order to locate these witnesses.  The prosecution relied solely

18   on Stephenson's testimony and petitioner has failed to provide declarations from these potential

19   witnesses that their testimony would have exculpated or even corroborated petitioner's version of

20   the transaction.

21          Moreover, during closing argument defense counsel questioned why the

22   prosecution failed to call these witnesses and relied solely on the testimony of Stephenson.

23   Defense counsel was able to cross-examine Stephenson as to the events underlying counts six

24   and seven.  This claim must also fail.

25          Next, petitioner contends that it was prosecutorial misconduct for the prosecution

26   to call Gerald Gordy from Ryder Logistics rather than petitioner's direct employer, Adecco, to

impeach petitioner as to whether or not he had left in a hurry to go to work with regard to counts four and five.  Gordy's testimony that petitioner had not worked there in 1998 was rehabilitated by the follow-up testimony that it was possible petitioner was called to work on that day but was turned away because he was not needed at that time.  (RT 461.)  The prosecution was not required to call the witness petitioner preferred.

Petitioner claims that the prosecution committed misconduct by arguing that petitioner lied about leaving to go to work, particularly in light of the testimony that petitioner might have reported and then been turned away.  The prosecution argued as follows:

> What's interesting is that he lied about his employment.  He didn't even work at this place in the entirety of 1998, at Ryder Logistics.

> I suppose the argument is going to be "Well, he got there and was basically told, "Well, we don't have any work for you today," but that's what he said.

> One of the instructions you have before you is, if somebody lies about a material part of their testimony, you can disbelieve everything they say.  I submit to you that that is just one of the many things that [petitioner] is lying about in this case.

(RT 492.)  Based on the record here, the prosecution's argument was fairly based on the evidence adduced at trial.  It was reasonable to infer that petitioner had been lying.  During closing argument, defense counsel argued that it was possible petitioner was sent home after he reported to work on that day.  (RT 516.)  No definitive evidence was produced confirming petitioner reported to work that day, other than petitioner's self-serving statement to that effect.  The jury was entitled to hear both sides and decide.

Finally, petitioner contends the prosecution attacked petitioner's defense theory on counts eleven and twelve by "testifying" that petitioner left Copeland's with a pair of shoes that were white.  Petitioner provides a copy of the Sacramento Police Department's property supplemental report identifying the shoe color as "W/BLU/SL."  (Pet.'s Ex. K.)  Petitioner argues that this report demonstrates the prosecutor mischaracterized the color of the shoes.

1    During closing argument, the prosecution replayed the video from Copeland's,

2   then argued:

3          All right.  15.15.42 on this tape, there is the box of shoes he just
           took.  That's the Macy's bag that he came in with, and he puts in
4          on top of the box.

5          Now at 15.16.08, those are not black shoes.  He knows now that he
           has the white shoes that Sally Halder is holding.  Those are the
6          same shoes he just took the security tags off of.

7          Now at 15.17.19, there he is.  He is picking up his Macy's bag and
           he is about to pick up those same shoes.  Clearly, he is stealing the
8          shoes that he selected from Copeland's.  There is no black shoe
           involved in this case whatsoever.

9   (RT 500.)

10   At trial, petitioner testified that the shoes he allegedly brought into Copeland's

11  were black with zippers.  (RT 422.)  But the prosecution argued that the videotape from

12  Copeland's showed the shoes petitioner left the store with were white.  (RT 500, 523.)  The

13  prosecution's comment on the evidence was fair because the "W" on the police report most likely

14  stands for white, so the shoes contained at least some portion of the color white.  The jurors saw

15  the video and were able to decide among themselves whether the video showed the color of the

16  shoes as white.

17   But in any event, the comment was not prejudicial because petitioner is faced with

18  two pieces of damaging evidence:  the property receipt, which did not reflect that the shoes were

19  black as petitioner testified they were, and the testimony of Ms. Halder, who testified that

20  petitioner entered the store carrying only a small Macy's bag, nothing else.  (RT 294-296.)  Also,

21  the jury was admonished that counsel's statements were not evidence.  Thus, petitioner's

22  eleventh claim for relief should also be denied.

23   L.  Twelfth Claim

24   Petitioner's twelfth claim is that the restitution order must be stricken because the

25  record fails to demonstrate petitioner's ability to pay, violating his right to due process.

26  /////

57

1    The California Supreme Court denied the claim without comment.  (Resp.'s

2  Answer, Ex. Y.)  Thus, there is no reasoned rejection of this claim by a state court.

3    This claim is not cognizable because the challenge to the restitution fines does not

4  affect the fact or duration of petitioner's custody.  See Calderon v. Ashmus, 523 U.S. 740, 747

5  (1998) (limiting § 2254 habeas to challenges to fact or duration of custody); United States v.

6  Thiele, 314 F.3d 399, 400 (9th Cir.2002) (finding challenge to restitution fine not cognizable on

7  habeas).  Accordingly, petitioner's twelfth claim for relief should be denied.

8    For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

9  application for a writ of habeas corpus be denied.

10    These findings and recommendations are submitted to the United States District

11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12  days after being served with these findings and recommendations, any party may file written

13  objections with the court and serve a copy on all parties.  Such a document should be captioned

14  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

15  failure to file objections within the specified time may waive the right to appeal the District

16  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17  DATED:  November 28, 2007.

18

19                                    UNITED STATES MAGISTRATE JUDGE

20

21  001; penn0760.157

22

23

24

25

26

58